**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Franklin Eugene NIXON,**
**Defendant–Appellant.**

**No. 79–5509.**

United States Court of Appeals,
Fifth Circuit.

Jan. 16, 1981.

G. Thomas Davis, Atlanta, Ga., for defendant–appellant.

James E. Fagan, Jr., Asst. U. S. Atty., Atlanta, Ga., John F. DePue, Atty., Appellate Sect., Crim. Div., U. S. Dept. of Justice, Washington, D.C., for plaintiff–appellee.

Before COLEMAN, Chief Judge, RONEY and GARZA, Circuit Judges.

RONEY, Circuit Judge:

Four years after counterfeit charges were voluntarily dismissed in response to a speedy trial motion, Franklin Nixon was convicted of perjury in denying to a grand jury any complicity with the counterfeiting. He asserts this denied him his right to a speedy trial, the perjury being but an extension of the counterfeit charge. We disagree. Finding no reversible error in his other points on appeal, we affirm.

In order to understand the speedy trial issue, the dates upon which certain events transpired are important.

On June 27, 1975, based on the testimony of an alleged accomplice, a complaint charging counterfeiting was filed against Nixon and he was arrested two days later. His home was searched pursuant to a search warrant, and a printing press, a paper cutter, a cloth wiper containing traces of green ink, and other evidence were seized. A search of his business premises revealed concealed above a room partition a quantity of paper of the type used for printing genuine currency.

Additional evidence against Nixon was not forthcoming, however. Divers searched the bottom of Lake Lanier where the accomplice indicated Nixon had disposed of counterfeiting paraphernalia. They were unable to locate any evidence. No other witnesses with compelling evidence against defendant were identified. Having only the accomplice's testimony and some physical evidence corroborating the story, the Assistant United States Attorney in charge of the case did not believe he could convince a jury Nixon was guilty beyond a reasonable doubt. Nixon was a wealthy man with a good reputation in the community and no apparent motive for engaging in counterfeiting. The prosecutor, recalling an earlier

attempt to convict a prominent citizen of counterfeiting on the basis of the testimony of an alleged accomplice, concluded he could not convict in the face of a parade of character witnesses he expected Nixon to present. So, when on November 20, 1975, some five months after his arrest, Nixon filed a speedy trial motion, the prosecutor voluntarily dismissed the charge under rule 48(a) of the Federal Rules of Criminal Procedure instead of responding to the motion.

The record indicates that during 1976 and the first part of 1977 the Assistant United States Attorney considered the case still open and believed the Secret Service was still actively investigating it, although he had no expectation that any particular piece of additional evidence would be located. During that time there were several contacts between the United States Attorney and defendant's attorney involving efforts by defendant to persuade the prosecution to drop the case and return the seized printing press and other evidence.

Sometime around the middle of 1977, the Secret Service came up with what is termed in the record "another piece of evidence" and located an additional witness that had previously been overlooked. Seeking to revitalize the case, the Government asked a grand jury to look into defendant's alleged counterfeiting.

Two witnesses were called before the grand jury on August 16, 1977, another was called on October 10, and on December 6 the defendant himself was called. Defendant read a statement to the grand jury and then answered the Assistant United States Attorney's questions, denying all involvement in counterfeiting. It was the answers to these questions which formed the basis for the later perjury indictment. The prosecutor did not seek an indictment for counterfeiting from the grand jury. Shortly thereafter the Assistant United States Attorney resigned, the case was assigned to another prosecutor, and nothing further happened for a year.

Then, in December 1978, a college student walking along the shore of Lake Lanier found a plastic bag containing counterfeit bills and counterfeiting paraphernalia, previously described to the Secret Service. Defendant's and the accomplice's fingerprints were found on several pieces of this evidence.

As a result of this discovery, on April 18, 1979, a new grand jury indicted Nixon for perjury allegedly committed in his appearance of December 6, 1977, in which he denied all knowledge of or complicity in the counterfeiting alleged to have taken place in 1975. He was tried and found guilty of six counts of perjury and was given six concurrent two–year jail sentences from which he now appeals.

### Speedy Trial/Due Process

Defendant contends the indictment should have been dismissed because the delay between his initial arrest for counterfeiting and his trial for perjury violated his rights to a speedy trial as guaranteed by the Sixth Amendment, and that the delay in bringing him to trial prejudiced his ability to defend himself and therefore is a violation of his right to due process under the Fifth Amendment.

Defendant relies heavily on *United States v. Avalos*, 541 F.2d 1100 (5th Cir. 1976), *cert. denied*, 430 U.S. 970, 97 S.Ct. 1656, 52 L.Ed.2d 363 (1977). In that case, the Government arrested defendant on drug charges in Washington, D. C. and then dismissed the charges in what the Court of Appeals for the D. C. Circuit found was a deliberate attempt at forum shopping. *United States v. Lara*, 172 U.S.App.D.C. 60, 520 F.2d 460 (D.C.Cir.1975). Defendant was rearrested in Miami and tried. Reviewing his speedy trial claim, we held the applicable period for a speedy trial ran continuously from his arrest in Washington until his trial in Miami, even though there was a nine–month period between the Washington dismissal and the Miami arrest when he was not under arrest or indictment.

*Avalos* would control this case in defendant's favor had his second trial been for counterfeiting. A complaint and arrest

is the type of public accusation that sets in motion the accused's right to a speedy trial, *Dillingham v. United States*, 423 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975) (*per curiam*); *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). Dismissing an indictment does not toll the speedy trial calendar when the next indictment is for precisely the same offense and the same transaction. *United States v. Avalos*, 541 F.2d at 1109.

It is clear from *Avalos*, however, as well as other cases, that "[f]or purposes of determining when the right to speedy trial attaches the *basis* for the arrest is critical." *Gravitt v. United States*, 523 F.2d 1211, 1215 n.6 (5th Cir. 1975) (emphasis in original). In *Gravitt*, petitioner was initially arrested on a state warrant charging armed robbery and assault. A search incident to the arrest revealed a large number of firearms. Some time later, a formal complaint and arrest warrant were filed by federal officials charging him with interstate transportation of firearms by a convicted felon. When the speedy trial question was presented, the Court focused on the basis of the arrest and held that the time was not to be measured from the time of the initial arrest but from the time the petitioner was accused of the crime he was then challenging. The cases of *United States v. DeTienne*, 468 F.2d 151 (7th Cir. 1972), *cert. denied*, 410 U.S. 911, 93 S.Ct. 974, 35 L.Ed.2d 274 (1973), and *United States v. Cabral*, 475 F.2d 715 (1st Cir. 1973), also make it clear that the basis of the arrest is critical.

Of course, if the second charge is but a part of or only gilds the initial charge, the initial arrest would start the critical period for trial. As the Seventh Circuit observed in *DeTienne*:

> [I]f the crimes for which a defendant is ultimately prosecuted really only gild the charge underlying his initial arrest and the different accusatorial dates between them are not reasonably explicable, the initial arrest may well mark the speedy

trial provision's applicability as to prosecution for all the interrelated offenses. 468 F.2d at 155.

Such is not the case here. The 1975 arrest was for counterfeiting. The conviction in 1979 was for perjury. While the perjury was related to the events of 1975, the actual offense of perjury for which defendant was indicted and convicted had not even occurred in 1975, nor would it occur for another two and a half years. The different accusatorial dates are thus very "reasonably explicable," and the perjury charge does not merely "gild the charge" underlying the original arrest. Even though proof of perjury must rely in part on the same facts as would support a counterfeiting charge, perjury is a distinct and separate offense. Even if the indictment for counterfeiting had been dismissed with prejudice on speedy trial grounds, the Government would still be permitted to use the underlying facts in that offense as the basis for a charge that the defendant committed the different offense of perjury. *See United States v. Stricklin*, 591 F.2d 1112, 1120 (5th Cir. 1979), *cert. denied*, 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1980) (When a prior indictment is dismissed, "the government is not barred from using the underlying facts in that offense as the basis for a charge that he committed a different offense").

A speedy trial claim as to each separate offense must stand or fall on its own merits, based upon when the defendant was accused, by arrest or indictment, of that specific offense. Hence, just as perjury committed when one testifies falsely in self–defense during the trial for a substantive offense is separate and distinct from the underlying offense and may be subsequently prosecuted, *see United States v. Williams*, 341 U.S. 58, 71 S.Ct. 595, 95 L.Ed. 747 (1951), the arrest for the initial offense, in this case counterfeiting, did not start the time for speedy trial for the subsequently committed perjury, even though it involved testimony relating to the initial offense.

Defendant argues that even if his conviction is not invalid under the speedy

trial provisions of the Sixth Amendment, we should invalidate it because he has been deprived of due process of law. The Supreme Court has held that the rights of defendants against excessive pre–accusation delay are protected by the Due Process Clause of the Fifth Amendment. *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). Under the Due Process Clause, dismissal for pre–accusation delay is required when it is shown that such delay "caused substantial prejudice to [defendant's] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." *United States v. Marion*, 404 U.S. at 324, 92 S.Ct. at 465. The Court held in *Lovasco* that when prosecution follows investigative delay, a defendant is not deprived of due process, even if his defense might have been prejudiced by the lapse of time. 431 U.S. at 795–96, 97 S.Ct. at 2051–2052.

■ Nothing in the record indicates the delay in this case was "an intentional device to gain tactical advantage over the accused." Rather, this is the type of investigative delay described in *Lovasco*, where the prosecutor "refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt." 431 U.S. at 795, 97 S.Ct. at 2051. The record negates bad faith or prosecutorial harassment. The grand jury inquiry was initiated only after newly discovered evidence and a new witness with significant testimony were brought to the prosecutor's attention. We also note that the perjury prosecution was commenced only after the discovery of the incriminating evidence on the lake shore and the verification that defendant's fingerprints were on that evidence. The *Marion* test has not been met and the Due Process Clause does not require defendant's conviction to be set aside.

### Materiality

As to the substance of the alleged crime, defendant contends his grand jury answers did not meet the materiality requirement for a perjury charge. A perjury conviction must be based upon testimony "material to any proper matter of inquiry." *United States v. Abrams*, 568 F.2d 411, 420 (5th Cir.), *cert. denied*, 437 U.S. 903, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978). *See also United States v. Jacobs*, 543 F.2d 18 (7th Cir. 1976), *cert. denied*, 431 U.S. 929, 97 S.Ct. 2632, 53 L.Ed.2d 244 (1977); *United States v. Phillips*, 540 F.2d 319, 327–28 (8th Cir. 1975), *cert. denied*, 429 U.S. 1000, 97 S.Ct. 530, 50 L.Ed.2d 611 (1976).

■ Defendant contends that by the time of his grand jury appearance any indictment returned against him for counterfeiting would have been subject to dismissal on speedy trial grounds because of his arrest two and one–half years earlier. He also contends the prosecutor had no other suspect in mind when he brought evidence before the grand jury. Therefore, defendant argues, his questioning was not material to any investigation the grand jury could properly conduct and his conviction should be reversed.

This argument misapprehends the nature of grand jury investigations. Even assuming that speedy trial provisions would bar the prosecution of a particular grand jury witness, or that the prosecutor does not have other suspects in mind, this does not prevent the grand jury from investigating an unsolved crime for which the statute of limitations has not run. Even if a person cannot be prosecuted for the crime under investigation, this does not give him license to commit perjury before the grand jury. *Cf. In re Grand Jury Proceedings*, 509 F.2d 1349 (5th Cir. 1975) (even immunized grand jury witness may not perjure himself); *United States v. Wilcox*, 450 F.2d 1131 (5th Cir. 1971), *cert. denied*, 405 U.S. 917, 92 S.Ct. 944, 30 L.Ed.2d 786 (1972) (same). The investigation being conducted by the grand jury was within the legitimate scope of its activities and the questions asked of defendant were material to that investigation.

■ Defendant also contends the district court erred by permitting evidence relating to materiality to be heard by the jury. While the issue of materiality is a question of law for the court and "evidence bearing solely on materiality should be received outside the presence of the jury," *United States v. Damato*, 554 F.2d 1371, 1373 (5th Cir. 1977); *see also Harrell v. United States*, 220 F.2d 516 (5th Cir. 1955), testimony which is relevant to the issue of willfulness or other issues at trial as well as to materiality may properly be heard before the jury. *Harrell v. United States*, 220 F.2d at 520. The testimony defendant objects to was relevant to the issue of willfulness and its admission was not error.

*Failure to Disclose a Grant of Immunity*

■ Defendant makes one other argument that merits discussion. He contends he is entitled to either a judgment of acquittal or a new trial because the Government made an undisclosed agreement with the accomplice for immunity in exchange for his testimony. Defendant contends that he had requested information about such an agreement and should have received pretrial notification of it. As to this issue, the panel is unanimous, Chief Judge Coleman having substantially prepared this part of the opinion.

The background facts that underlie this assertion are briefly as follows:

On June 5, 1975, in Orlando, Florida, Robert Pratt was arrested for distributing counterfeit $5 bills. Pratt told the Secret Service he had obtained the bills from Jim Gunnin, an employee of the Harold Pittman Company in Atlanta, Georgia. Gunnin was arrested and charged with counterfeiting. Gunnin agreed to cooperate with the authorities on the condition that his cooperation would be made known to the judge should he be convicted. Gunnin named as his source defendant Frank Nixon, the national Vice–President of the Harold Pittman Company. Gunnin said that he and the defendant had made the counterfeit bills together on a printing press in the basement of Nixon's home, and that after

Nixon discovered the Secret Service was closing in on the operation, he disposed of the counterfeiting paraphernalia by dumping it into Lake Lanier, near his summer home. The charges against Gunnin were dropped in September 1977, over a year after the counterfeiting charge against Nixon was dropped. Gunnin testified at the perjury trial.

On June 13, 1980, after oral argument of this appeal, this Court ordered a limited remand for a full hearing in the district court on whether the Government had, in fact, made a deal with Mr. Gunnin in return for his testimony. This hearing was promptly held July 1, 1980. Taking into account the testimony given at this hearing and the testimony presented at the 1979 trial, the following picture emerges concerning the arrangement the Government made with Mr. Gunnin.

The prosecutors and Gunnin agree that in 1975 Gunnin received no promises in exchange for his agreement to testify against Nixon. The prosecution told Gunnin only that if he cooperated fully, the judge would have this brought to his attention when Gunnin was sentenced for his part in the counterfeiting. Even though he had confessed his guilt, Gunnin was never called before a grand jury or put under oath. In September 1977, Gunnin asked to have the charges dismissed and the Government so moved under Fed.R.Crim.P. 48(a).

In 1979, in preparing to try Nixon for perjury, the new prosecutor, James Fagan, decided Gunnin would be a more credible witness against Nixon if he pleaded guilty to the charge of counterfeiting (although it had been dismissed two years previously) and thus did not appear to profit from his testimony. Fagan talked to Gunnin and suggested that he plead guilty. Gunnin had previously dealt with Assistant United States Attorney Ludwick, not Fagan, and this was not what he expected to hear from the prosecutor. Although the prosecutors, Gunnin, and his attorney all testify that Gunnin had received no promises of immunity up to that point in 1979, the dismissal of charges against Gunnin in 1977 had led

him to believe that he would not be prosecuted.

Gunnin called his attorney, Eric Welch, and they set up a meeting with Fagan on June 7, 1979. The meeting lasted 15–30 minutes. Welch told Fagan that if Gunnin was required to plead guilty, he would instruct him to refuse to testify against Nixon because it would tend to incriminate him. Fagan then retreated from his attempt to get Gunnin to plead guilty. He said he had no intention of prosecuting Gunnin because that would violate his speedy trial rights. He said the passage of four years since the initial arrest of Gunnin would make a new indictment dismissable because of a violation of Gunnin's rights to a speedy trial under the Sixth Amendment to the Constitution. Fagan told Gunnin that because of this Gunnin could not incriminate himself by testifying against Nixon. Welch asked Fagan for some tangible proof of this intention not to prosecute, in case another prosecutor took over the case. Fagan proposed that they go before a judge for some form of declaratory judgment that the Sixth Amendment prevented prosecution of Gunnin for the 1975 counterfeiting. Welch decided these verbal assurances were adequate and no such appearance before a judge would be necessary. He instructed Gunnin to testify.

Fagan, Welch, and Gunnin all testified there was no agreement or consideration in the form of immunity to Gunnin in exchange for his cooperation. It is certainly true that there was no agreement in *express terms*, specifically saying, in so many words, that "I shall do thus and so, if you do thus and so," but our analysis of what happened at the June 7 meeting compels us, nevertheless, to conclude that the parties then came to an agreement. It was an agreement which had not existed before the meeting and one which would have been enforceable had the Government deviated from its terms. It was one which would have been wholly unnecessary–not even the subject of discussion–if the Government had not been trying to assure itself of Gunnin's indispensably necessary testimony concerning the counterfeiting activities of Nixon. Moreover, the prosecutor initiated the discussions because he wished, by the plea, to make it appear to the jury that Gunnin was not getting anything in return for his testimony.

Gunnin came to the June 7 meeting with Fagan in an agitated state, taking the position that he would refuse to testify if Fagan insisted that he plead guilty. Gunnin had previously cooperated completely with the Government, so this was a change in his position. In response to this, Fagan gave Gunnin absolute guarantees that he would not be prosecuted, an assurance which Gunnin had not previously received. Both the prosecutor and Gunnin yielded something highly desired by the other. What it all came to was a clear understanding: the Government guaranteed that Gunnin would not be prosecuted and Gunnin agreed to testify.

The defense was entitled to know about this agreement for impeachment purposes, and the Government was compelled to disclose it under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). There is no doubt that had this agreement remained secret during the trial, Nixon would be entitled to a new trial. *Giglio v. United States*, 405 U.S. 150, 153–54, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

Yet even though defendant had no advance notice of what went on at the June 7 meeting, the facts nevertheless came out on cross–examination at the trial on the merits. In that cross–examination Gunnin admitted from the witness stand that he had never been indicted for counterfeiting and he had never been subpoenaed before a grand jury. He admitted the recent meeting with the prosecutor, in which he had been told he could either testify because it was too late for the Government to pursue the counterfeiting charge, or they could give him immunity and command him to testify, and that either way he would not be prosecuted for counterfeiting. To quote him exactly, near the close of his testimony,

"If I didn't want to testify, they would grant me immunity and make me testify. But, they couldn't prosecute us on the counterfeiting charge anyway, so I really didn't have a choice . . . ."

On oral argument in Atlanta, we deemed it our duty to order a limited remand to ascertain if all of the facts surrounding this very sensitive June 7 meeting had come out on cross–examination. The able district judge promptly held a full–scale hearing, at which Gunnin, the prosecutor, and Gunnin's attorney at the time of the meeting all testified. We have read the testimony and it adds nothing material to what was learned and laid before the jury when Gunnin was cross–examined at the trial.

The inevitable result is that while the Government should have made a full disclosure of this meeting in advance of the trial, the defense alertly brought it out. The jury had the benefit of it insofar as it might have affected Gunnin's credibility. Nixon's counsel contends that had he received advance notice of this June 7 agreement and thus had been made familiar with its details before trial, he would have been better able to cross–examine Gunnin. The limited remand hearing, however, revealed nothing beyond what resourceful counsel had already elicited in the presence of the jury, and there is no indication in that hearing that prior knowledge of the June 7 agreement would have aided the cross–examination. The failure of the prosecution to make full disclosure of this meeting and what happened there is not to be commended. Nevertheless, the late disclosure in no way prejudiced full impeachment of Gunnin in connection therewith and we may not reverse for this failure. *See, e. g., United States v. Campagnuolo*, 592 F.2d 852, 860 (5th Cir. 1979); *United States v. Arcentales*, 532 F.2d 1046 (5th Cir. 1976); *United States v. Scott*, 524 F.2d 465, 468 (5th Cir. 1975).

### Other Contentions

■ Defendant argues that the counts of the indictment are multiplicious. We disagree. While separate perjury counts based upon a rephrasing of the same question are improper, "if a witness before a grand jury tells two separate and distinct lies, he may be prosecuted on a separate count for each lie." *United States v. Tyrone*, 451 F.2d 16, 18 (9th Cir. 1971), *cert. denied*, 405 U.S. 1075, 92 S.Ct. 1494, 31 L.Ed.2d 808 (1972). Here, as shown by examination of the various counts, each question sought information relating to a different aspect of the counterfeiting operation and the proof of each falsehood required the establishment of different facts. Under these circumstances, the indictment was not multiplicious.

Defendant makes several allegations of erroneous evidentiary rulings by the trial court. We have considered each one and have not found any abuse of discretion or any reversible error by the trial court.

Defendant contends that in instructing the jury the court improperly suggested defendant was guilty of other acts of counterfeiting. Viewing the instructions in their entirety and in the context of the evidence at trial, *see Park v. United States*, 421 U.S. 658, 674–75, 95 S.Ct. 1903, 1912–1913, 44 L.Ed.2d 489 (1975), we find no reversible error.

AFFIRMED.

COLEMAN, Chief Judge, concurring in part and dissenting in part.

Except as hereinafter indicated I concur in the foregoing opinion of the Court. I would totally concur if the government had not deliberately stripped Nixon of his speedy trial rights on the counterfeiting charges by dismissing the complaint against him while thereafter persisting in its efforts to find a way to convict him. Additionally, because Nixon was the sole suspect when called before the grand jury and could not at that time have been prosecuted for counterfeiting I believe that his interrogation was immaterial.

If I were to look at the situation as it is compartmentally viewed in its respective parts by the opinion so excellently written by Judge Roney I would agree all the way and it may be that my reasoning is simply

wrong. Nevertheless, I feel that in evaluating the constitutional rights of the citizen against the government in a criminal case the picture must be viewed as a whole, else constitutional rights could be nibbled away, one fragment at a time.

With these preliminary observations, I state my views of this case.

On June 29, 1975, the government saw fit to charge Nixon with counterfeiting.

On December 8, confronted with a speedy trial motion, the government evaded the speedy trial guarantee by dismissing the complaint.

It is undisputed that this action was taken because it was the considered judgment of the prosecution that on the evidence it then had a conviction could not be expected.

Even so, the government continued to investigate, hoping to come up with something that would get a conviction. Therefore, it can hardly be doubted that the dismissal was strategical and it must be assumed that had Nixon been given his rights he would have been acquitted.

TWO YEARS after the complaint had been dismissed in response to a speedy trial motion the government had no evidence beyond what it had available at the date of the dismissal. Nevertheless, the prosecutor hit upon the idea that if Nixon were called before a grand jury he would admit his guilt. Nixon appeared and denied guilt.

A year later, the incriminating evidence was discovered. Nixon was indicted, not for the counterfeiting which this evidence supported but for falsely denying his guilt to the 1978 grand jury.

If I were deciding this case individually I would hold that when the grand jury, at the instance of the prosecutor and for the effectuation of his strategy, called Nixon for interrogation about the counterfeiting, as the sole suspect, it was conducting an immaterial investigation because Nixon could not have been tried for the counterfeiting even if he had been indicted.

I agree, of course, that perjury is never to be justified or condoned, whatever the circumstances. I believe, also, that prosecutions for perjury are subject to constitutional restrictions exactly like any other prosecution.

To prove the perjury the government, having defeated Nixon of his speedy trial for that offense, had to prove that offense as the indispensable basis for its perjury conviction. To that extent at least, Nixon's right to a speedy trial has been successfully circumvented. The government strategy worked.

Everyone would agree, of course, that for perjury to be an offense it must have been committed with reference to a material matter.

Having stated my appraisal of this case I shall not belabor the matter with a protracted discussion of *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

I believe that if the government judges its evidence to be insufficient and for that reason evades a speedy trial motion by dismissing the complaint, in the hope that it can compile a better case later, and is thereafter allowed to revive the charges in the manner used in this case the constitutional right to a speedy trial has been violated. I think we are taught that by *Klopfer v. North Carolina*, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967). There, a unanimous Supreme Court held that if a prosecutor, by nolle prosequi, over objection, defers trial for an unlimited time, governed by his own discretion, the right to a speedy trial is violated.

And, in any event, when interrogating Nixon the grand jury was pursuing an immaterial matter, *United States v. Icardi*, 140 F.Supp. 383 (1956).

To the extent stated, and with great deference, I respectfully dissent.