**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 6, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

AUSTIN RAY,

    Defendant - Appellant.

No. 16-1306

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:14-CR-00147-MSK-2)**
_____

Jason B. Wesoky, Darling Milligan Horowitz PC, Denver, Colorado, for Defendant-Appellant.

Hetal J. Doshi, Assistant United States Attorney (Robert C. Troyer, Acting United States Attorney, with her on the brief), Denver, Colorado, for Plaintiff-Appellee.
_____

Before **HARTZ**, **McKAY**, and **MORITZ**, Circuit Judges.
_____

**MORITZ**, Circuit Judge.
_____

Austin Ray appeals his jury convictions for one count of conspiracy to defraud the United States, five counts of aiding in the preparation of a false tax return, and two counts of submitting a false tax return. In challenging his convictions, Ray first asserts that the government violated the Interstate Agreement on Detainers Act (IAD)

of 1970, 18 U.S.C. app. 2 § 2. But because the government never lodged a detainer against Ray, the IAD didn't apply and the district court didn't err in denying Ray's motion to dismiss on this ground. Next, Ray alleges that the government engaged in vindictive prosecution. Yet Ray establishes neither actual nor presumptive vindictiveness, so this argument also fails. So too does his assertion that the district court violated his rights under the Speedy Trial Act (STA) of 1974, 18 U.S.C. §§ 3161–74; Ray waived the STA argument he advances on appeal by failing to raise it below, and in any event, Ray's STA clock never surpassed 70 days. Ray's next argument—that the government violated his due-process rights by destroying certain evidence—is also flawed. The evidence at issue lacked any exculpatory value. And even if the evidence were potentially useful to Ray's defense, the government didn't destroy it in bad faith. Finally, we reject Ray's assertion that the district court constructively amended the indictment; the district court narrowed, rather than broadened, the charges against Ray. Accordingly, we affirm.

## Background

In March 2006, Ray and his wife opened a tax-preparation firm, Cheapertaxes LLC. To expand their business, Ray and his wife relied on word-of-mouth referrals from clients who received large tax refunds. Over the next four years, they greatly exaggerated their clients' itemized deductions, including Schedule A deductions like job expenses and charitable contributions, so that their clients would receive larger tax refunds. Thus, Ray and his wife knowingly prepared and submitted many false tax returns to the Internal Revenue Service (IRS).

2

In April 2014—while Ray was living in a residential facility and participating in Colorado's community-corrections program as the result of unrelated offenses—the government arrested him on the federal tax-fraud charges central to this appeal. The government also charged Ray's wife with tax fraud. She pleaded guilty, but Ray rejected the government's plea offer. He represented himself at trial, and the jury convicted him on all counts. The district court imposed a 120-month sentence. Ray appeals, raising five issues.

## Analysis

### I. The Interstate Agreement on Detainers Act

Ray first argues that the government violated the IAD when it twice transported him to and from Colorado before his federal trial concluded. The district court denied Ray's motion to dismiss based on the IAD. It found that the IAD didn't apply because the government never lodged a detainer against Ray with Colorado to begin with, and therefore the government could not have violated it. "We review a decision on a motion to dismiss under the IAD for abuse of discretion. As always, any legal questions implicated by that conclusion are reviewed de novo and any factual findings for clear error." *United States v. Gouse*, 798 F.3d 39, 42 (1st Cir. 2015) (citation omitted).

No one disputes that once a "[r]eceiving [s]tate" lodges a detainer for a prisoner who is in the custody of a "[s]ending [s]tate," the IAD governs the transfer

of that prisoner.[1] § 2, Art. II. Instead, the parties disagree about (1) what constitutes a detainer and (2) whether the government in this case ever lodged a detainer with Colorado.

Generally speaking, a detainer is "a legal order that requires a [s]tate in which an individual is currently imprisoned to hold that individual when he has finished serving his sentence so that he may be tried by a different [s]tate for a different crime." *Alabama v. Bozeman*, 533 U.S. 146, 148 (2001); *see also United States v. Mauro*, 436 U.S. 340, 359 (1978) (describing detainer as "a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction" (quoting H.R. Rep. No. 91-1018, at 2 (1970); S. Rep. No. 91-1356, at 2 (1970))).

Ray asserts the district court erred in ruling that the federal government never lodged a detainer for him with Colorado. First, he maintains that all arrests constitute detainers under the IAD. In support, Ray points out that (1) the IAD fails to define detainer and (2) an arrest fits within the definitions that other sources, including Black's Law Dictionary, provide for that term.

It's true that the IAD doesn't define detainer. But we need not speculate about whether an arrest can arguably fit within general legal definitions of that term. That's because we are bound by the pronouncements of the Supreme Court, and the

---

[1] For purposes of the IAD, the receiving state is where a subsequent, untried indictment has been filed against a prisoner. § 2, Art. II(c). And the sending state is where a prisoner is currently serving a sentence. *Id.* at Art. II(b). The federal government constitutes a "[s]tate." *Id.* at Art. II(a).

4

Supreme Court has defined detainer on multiple occasions to mean something specific in the context of the IAD. *See Bozeman*, 533 U.S. at 148; *Mauro*, 436 U.S. at 359 (defining detainer as "a notification filed with the institution in which a prisoner is serving a sentence" (quoting H.R. Rep. No. 91-1018, at 2 (1970); S. Rep. No. 91-1356, at 2 (1970))). Because an arrest isn't "a notification filed with the institution in which a prisoner is serving a sentence," it doesn't fit within the Supreme Court's binding definition of detainer. *Id.* (quoting H.R. Rep. No. 91-1018, at 2 (1970); S. Rep. No. 91-1356, at 2 (1970)); *see also Bozeman*, 533 U.S. at 148.

Next, Ray appears to broadly suggest that, by the process of elimination, his arrest must necessarily have been a detainer. According to Ray, the government can only obtain custody of a defendant who is serving a sentence in another jurisdiction via (1) a writ of habeas corpus *ad prosequendum*,[2] or (2) a detainer. And because the government indisputably didn't file a writ of habeas corpus *ad prosequendum*, Ray concludes his arrest was necessarily a detainer. Yet Ray fails to develop or provide any authority for his suggestion that one jurisdiction can obtain custody of a defendant who is serving a sentence in another jurisdiction only through (1) a writ of habeas corpus *ad prosequendum* or (2) a detainer. Thus, he's waived this argument. *See* Fed. R. App. P. 28(a)(8)(A) (stating that appellant's opening brief must contain "appellant's contentions and the reasons for them, with citations to the authorities . . . on which the appellant relies"); *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir.

---

[2] A writ of habeas corpus *ad prosequendum* is an order issued by a federal district court requiring the state to produce a state prisoner for trial on federal criminal charges. *Mauro*, 436 U.S. at 357–58. It is not a detainer. *See id.* at 361.

5

2007) (holding that arguments inadequately presented in appellant's opening brief are waived). In any event, as we've discussed, an arrest doesn't fit within the Supreme Court's definition of detainer. *See Bozeman*, 533 U.S. at 148; *Mauro*, 436 U.S. at 359. As such, even if we considered Ray's waived argument, we would reject it.[3]

But our conclusion that Ray's arrest did not constitute a detainer doesn't end our inquiry. Ray alternatively contends that even if his arrest didn't constitute a detainer, the government nevertheless lodged a detainer with Colorado through other means. In support, Ray points to the following facts.

The day after Ray's federal arrest, Gary Pacheco—the parole liaison for Colorado's community-corrections program—completed a form used to explain the reasons an offender is in custody and submitted it to the Colorado Department of Corrections. On that form, Pacheco wrote that the pending federal charges rendered Ray ineligible for Colorado's community-corrections program. Further, Pacheco twice used some iteration of the words "felony detainer." First, under the "[s]pecial [i]nstructions" heading, he wrote that Ray should be "place[d] in [D]enver county jail for r[e]gress to DOC, felony detainer feds." R. vol. 2, 367. Next, he wrote that the "justification" for this action was "felony charges from [f]ederal government detainer, no longer eligible for community[-]corrections, related to tax theft." *Id.*

---

[3] We note that when the government arrested Ray, he wasn't incarcerated in a Colorado state prison. Instead, he was living in a residential facility and participating in Colorado's community-corrections program. But Ray doesn't argue that this aspect of his arrest has any bearing on whether his arrest constituted a detainer. Accordingly, we decline to consider that possibility. *See United States v. Harrell*, 642 F.3d 907, 912 n.2 (10th Cir. 2011) (treating as waived and declining to consider argument that appellant failed to advance on appeal).

Ray suggests that Pacheco's repeated use of the term detainer indicates that the government must have lodged a detainer with Colorado. We disagree. Pacheco completed this form based on his telephone conversation with IRS agent Arlita Moon. And Pacheco testified that Moon neither uttered the word "detainer" during the call nor instructed him to hold Ray. In fact, Pacheco admitted that using the phrase "felony detainer" on the form "was probably a bad choice of word[s] on [his] part." R. vol. 6, 1306. As such, we reject Ray's contention that the mere appearance of the word "detainer" on the form means that the government in fact lodged a detainer against Ray. *See United States v. Reed*, 620 F.2d 709, 711 (9th Cir. 1980) (finding that district court "properly concluded" that notation "Hold for U.S. Marshals" wasn't detainer because "it was made by a state officer, without the direction of a federal agent or officer").

Relying on *United States v. Trammel*, 813 F.2d 946 (7th Cir. 1987), Ray alternatively suggests that that the phone call between Moon and Pacheco itself constituted a detainer. But *Trammel* supports the opposite conclusion. There, a United States Marshal telephoned a local jail to provide advance notification that federal authorities would appear with a writ to pick up the defendant for an appearance in federal court. *Trammel*, 813 F.2d at 947. The sheriff's deputy who took the call placed a memo in jail records that the marshal would pick up the defendant and would "bring [the] writ along." *Id.* After the defendant was picked up and arraigned, he was returned to the jail. *Id.* But the marshal later mailed a detainer to

7

the jail to ensure the defendant would be returned to federal custody upon expiration of his sentence. *Id.* at 947–48.

The defendant sought dismissal of the federal charges against him, arguing that the marshal's telephone call to the deputy was a detainer because (1) "it was a 'notification' to a state 'institution' that [the defendant] was 'wanted to face pending criminal charges in another jurisdiction'"; and (2) the deputy's notation in jail records constituted the filing of a detainer. *Id.* at 948. Thus, he contended, authorities violated the IAD when they returned him to state custody without first trying him on federal charges. *Id.*

In rejecting the defendant's argument, the Seventh Circuit in *Trammel* concluded that it couldn't label the telephone call and notation a detainer "without running afoul of the Supreme Court's decision in *Mauro*." *Id.* at 950. Notably, in refusing to classify the phone call as a detainer, the Seventh Circuit reasoned that doing so "would serve only to inhibit informal courtesy notifications of a kind that save time and trouble on both ends, expedite the procedures[,] and contribute in small but meaningful ways to the intergovernmental comity that is among the expressed purposes of the [IAD] itself." *Id.* at 949. Thus, nothing about the Seventh Circuit's holding in *Trammel* supports Ray's assertion that Moon's courtesy phone call mentioning Ray's arrest on federal charges transformed the call into a detainer under the IAD.

In short, we conclude that the district court did not abuse its discretion in denying Ray's motion to dismiss based on the IAD. Because the government never lodged a detainer with Colorado, the IAD didn't apply. And because the IAD didn't

8

apply, the government could not have violated it when it transported Ray to and from Colorado.

## II. Vindictive Prosecution

Ray next argues that the government's decision to add two counts to a superseding indictment—allegedly in retaliation for his refusal to enter a plea—amounts to vindictive prosecution. He argued as much below, but the district court disagreed and concluded that Ray failed to present facts demonstrating prosecutorial vindictiveness. We review this conclusion de novo. *United States v. Wall*, 37 F.3d 1443, 1448 (10th Cir. 1994).

Vindictive prosecution occurs when the government retaliates against a defendant for exercising his or her constitutional or statutory rights, such as the right to file an appeal or the right to present a defense. *See Bordenkircher v. Hayes*, 434 U.S. 357, 362–63 (1978). To succeed on a claim of prosecutorial vindictiveness, the defendant must show either actual or presumptive vindictiveness. *United States v. Creighton*, 853 F.3d 1160, 1162 (10th Cir. 2017). Actual vindictiveness occurs when the government's decision to prosecute "was 'a direct and unjustifiable penalty for the exercise of a procedural right'" by the defendant." *United States v. Raymer*, 941 F.2d 1031, 1041 (10th Cir. 1991) (quoting *United States v. Goodwin*, 457 U.S. 368, 384 n.19 (1982)). To establish presumptive vindictiveness, on the other hand, the defendant must show that "as a practical matter, there is a realistic or reasonable likelihood of prosecutorial conduct that would not have occurred but for hostility or

punitive animus towards the defendant because he exercised his specific legal right." *Wall*, 37 F.3d at 1448 (quoting *Raymer*, 941 F.2d at 1042).

Critically, courts tend to find presumptive vindictiveness only in post-trial situations, such as "when a defendant successfully attacks his first conviction and then receives a harsher sentence on retrial, or when 'the "prosecutor clearly has a considerable stake in discouraging convicted misdemeanants from appealing"' by charging a successful appellant with a felony covering the same facts." *Id.* (quoting *United States v. Miller*, 948 F.2d 631, 633 (10th Cir. 1991)). Yet the Supreme Court has declined to credit these presumptions in the pretrial setting. *See id.* Indeed, "neither the Supreme Court nor the Tenth Circuit has ever" found presumptive vindictiveness in a pretrial setting. *Creighton*, 853 F.3d at 1164.

Here, Ray claims prosecutorial vindictiveness in the pretrial setting. Specifically, he argues that after he declined to accept a plea offer, the government retaliated against him by filing a superseding indictment that added two additional counts to the original indictment. Ray doesn't specify whether he contends these circumstances demonstrate actual or presumptive vindictiveness. But because he provides no evidence of actual vindictiveness—and because we have found none—we will assume that Ray alleges presumptive vindictiveness. In support of this allegation, Ray asserts that the government (1) could have included the two new counts in the original indictment but failed to do so, (2) declined to add those counts against his wife who, unlike Ray, agreed to enter a guilty plea, and (3) charged those counts only after Ray filed several pretrial motions and rejected a plea offer.

10

But these three facts, even taken together, do not establish presumptive vindictiveness. First, as noted above, Ray's allegations arise from a pretrial situation, where we've never before found presumptive vindictiveness. *See Creighton*, 853 F.3d at 1164. Second, the facts that Ray alleges don't convince us that this is the case in which to do so. Adding new counts to an indictment typically falls well within the bounds of prosecutorial discretion, at least where there exists probable cause to support those counts. *See Hayes*, 434 U.S. at 364 ("[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [the prosecutor's] discretion.").

This general rule applies where, as here, a prosecutor adds counts after a defendant rejects a plea offer. *See Goodwin*, 457 U.S. at 380 ("An initial indictment—from which the prosecutor embarks on a course of plea negotiation—does not necessarily define the extent of the legitimate interest in prosecution."). And it also applies where, as here, the prosecutor (1) adds counts against a defendant who rejects a plea offer but (2) doesn't add counts against a codefendant who accepts one. *See id.* (noting prosecutor's discretion to "forgo legitimate charges"). Thus, we decline to presume that the prosecutor vindictively added the new counts to retaliate against Ray for refusing to enter a plea. And we likewise decline to presume that the prosecutor vindictively added the new counts to retaliate against him for filing certain pretrial motions. *See id.* at 381 (cautioning that it's "unrealistic to assume that a prosecutor's . . . response to such motions is to seek to penalize and to deter").

11

Because Ray fails to show a realistic likelihood of vindictiveness that gives rise to a presumption of vindictiveness, the district court did not err in denying Ray's motion to dismiss for vindictive prosecution.

## III.    The Speedy Trial Act

Next, Ray contends the district court violated his rights under the STA. We generally "review de novo the district court's compliance with the [STA]'s legal requirements" and review its factual findings for clear error. *United States v. Thompson*, 524 F.3d 1126, 1131 (10th Cir. 2008). To the extent Ray's argument turns on his assertion that the district court misinterpreted a statement that Ray made at an evidentiary hearing, we review that portion of Ray's argument for abuse of discretion. *Cf. Barnett v. Hargett*, 174 F.3d 1128, 1133 (10th Cir. 1999) (explaining that "sorting th[r]ough pro se pleadings is difficult at best" and that we typically don't "interfere with the district court's" interpretation of them).

Under the STA, a criminal trial must commence within 70 days from the indictment's filing or the defendant's initial appearance in court, whichever date occurs later. § 3161(c)(1). But several periods of time are excluded from the 70-day requirement. For example, as relevant to Ray's arguments here, any "delay[s] resulting from any pretrial motion" don't count toward the 70 days. § 3161(h)(1)(D). Thus, the 70-day clock is tolled from the day a litigant files a pretrial motion until the day the court resolves it. *Id.* Additionally, if either party requests a continuance and the district court determines that such a continuance would serve "the ends of

12

justice," then any delay resulting from that continuance doesn't count against the 70 days either. § 3161(h)(7).

Further, and critical to this case, a defendant's pretrial motion to dismiss under the STA must include the specific STA objection that he or she raises on appeal; otherwise that objection is waived. *See United States v. Loughrin*, 710 F.3d 1111, 1120–21 (10th Cir. 2013) (finding that defendant waived specific objection he advanced on appeal by failing to include it in pretrial motion to dismiss based on STA), *aff'd on other grounds*, 134 S. Ct. 2384 (2014); *id.* at 1121 (interpreting § 3162(a)(2) "to mean that we may not conduct any review of [STA] arguments unraised below, not even for plain error").

Here, the crux of Ray's STA claim is that the district court misinterpreted Ray's statements at an October 26, 2015 evidentiary hearing. During the hearing, Ray stated, "[T]here is a lot of stuff, a lot of discovery that was ordered that I just never received." R. vol. 6, 1338. After the hearing, the district court issued a minute order interpreting Ray's comment as an oral motion for discovery. That characterization effectively tolled the speedy-trial clock until the district court disposed of the motion on November 19. *See* § 3161(h)(1)(D).

Yet Ray didn't file an objection to the minute order. Nor did he object when the district court disposed of the oral discovery motion. And in subsequent pretrial motions and hearings, Ray never addressed the minute order. Most critically, in his pretrial motion to dismiss based on the STA, he failed to challenge the district court's characterization of his statement as a discovery motion that tolled the speedy-trial

13

clock. Nevertheless, Ray now maintains that the district court violated his rights under the STA because it incorrectly interpreted his comment at the October 26 hearing as an oral motion for discovery that tolled the speedy-trial clock. And he argues that in the absence of that allegedly erroneous interpretation, more than 70 days elapsed on his speedy-trial clock.

We conclude that Ray waived this argument by failing to make it in his pretrial motion to dismiss based on the STA. True, he raised this objection in a post-trial motion for relief, which he filed nearly six months after the district court issued the minute order and four months after the trial ended. But that doesn't change the fact that Ray didn't address the minute order in his pretrial motion to dismiss. Thus, we find this argument waived. *See Loughrin*, 710 F.3d at 1120–21.

Alternatively, even if Ray had not waived this this argument, we would reject it on the merits. That's because even if we assume that the district court wrongly characterized Ray's statement as a discovery motion that tolled the speedy-trial clock, Ray's speedy-trial clock never surpassed 70 days.

Initially, in May 2014, five days elapsed on the clock before Ray's pretrial motions and the district court's ends-of-justice continuances began to toll it. *See* § 3161(h)(1)(D), (7). But when the government filed a superseding indictment on December 2, 2014, the speedy-trial clock reset to zero, wiping out those five days.[4]

---

[4] In a footnote in his opening brief, Ray insists that the superseding indictment didn't reset his speedy-trial clock. But arguments made in a cursory manner, such as in a footnote, are waived. *See United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002). And even if we agreed to address this waived argument on the merits, we

14

Then, again due to pretrial motions and ends-of-justice continuances, no time elapsed on Ray's speedy-trial clock from the date the government filed its superseding indictment until the October 26, 2015 evidentiary hearing. *See id.*

If we accept Ray's waived argument that he did *not* make a discovery motion at that October 26 hearing, then his speedy-trial clock started ticking on October 27. He tolled the clock again eight days later when he filed a pretrial motion for reconsideration. *See id.* On November 19, the district court disposed of Ray's reconsideration motion, so his clock resumed ticking on November 20. *See id.* Ray's trial commenced 60 days later on January 19, 2016. Accordingly, after including the eight days from October 27 to November 4, 2015, a total of 68 days elapsed on Ray's

---

would reject it. "As a general rule, new [STA] periods begin to run with respect to an information or indictment adding a new charge not required to be brought in the original indictment." *Andrews*, 790 F.2d at 808. But "when the later charge is merely a part of or only 'gilds' the initial charge, the subsequent charge is subject to the same Speedy Trial Act limitations imposed on the earlier indictment." *Id.* (quoting *United States v. Nixon*, 634 F.2d 306, 309 (5th Cir. 1981)).

Here, the original indictment alleged that Ray conspired to prepare false tax returns *for others* and aided and abetted in the preparation of false tax returns *for others*. The superseding indictment, however, charged Ray with preparing *his own* false tax returns. And fraudulently preparing one's own personal tax returns is legally and factually distinct from preparing fraudulent tax returns for others. *Compare* 18 U.S.C. § 371 (prohibiting conspiracy to defraud United States), *and* 26 U.S.C. § 7206(2) (prohibiting aiding and abetting fraud), *with* § 7206(1) (prohibiting making false declaration under penalties of perjury). Accordingly, the charges brought in the superseding indictment didn't simply "gild[]" the charges in the original indictment; instead, they constituted "new charge[s] not required to be brought in the original indictment." *Andrews*, 790 F.2d at 809 (quoting *Nixon*, 634 F.2d at 309); *see also United States v. Olivo*, 69 F.3d 1057, 1062 (10th Cir. 1995) (ruling that superseding indictment reset speedy-trial clock, in part because "the superseding indictment added an additional conspiracy count"). Under these circumstances, the superseding indictment reset Ray's speedy-trial clock.

15

speedy-trial clock. Thus, even if we reached Ray's waived argument and accepted its premise, it would nevertheless fail on the merits. The district court did not err in denying Ray's motion to dismiss based on the STA.

## IV.    Evidence Destruction and Due Process

Ray next argues that the government violated his due-process rights when it destroyed a letter he wrote to the IRS in 2007. He further asserts that the government knew this letter was exculpatory, and that his inability to present the letter to the jury prejudiced his defense. Alternatively, he asserts that even if the letter's exculpatory value wasn't apparent at the time the government destroyed it, the evidence was potentially helpful to his defense, and the government destroyed that evidence in bad faith. The district court held that the letter wasn't exculpatory and that the government didn't destroy the letter in bad faith. We review both of these rulings for clear error. *United States v. Bohl*, 25 F.3d 904, 909 (10th Cir. 1994).

The Due Process Clause of the Fourteenth Amendment requires the government to disclose exculpatory evidence to a criminal defendant. *California v. Trombetta*, 467 U.S. 479, 485 (1984). When the government fails to preserve exculpatory evidence, we will find a due-process violation if the defendant can show that (1) the missing evidence "possess[ed] an exculpatory value that was apparent before the evidence was destroyed," and (2) "the defendant [was] unable to obtain comparable evidence by other reasonably available means." *Id.* at 489. But if the evidence's exculpatory value wasn't apparent at the time the government destroyed it, then the government's conduct violates a criminal defendant's due-process rights

16

only if (1) the evidence was potentially useful for the defense and (2) the government acted in bad faith in destroying it. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

Here, Ray argues that the government violated his due-process rights when the IRS destroyed a 2007 letter in which Ray challenged the IRS' decision to suspend his ability to electronically file tax returns. Because the IRS destroyed Ray's letter pursuant to its standard destruction policy in 2011, the government was unable to produce it at Ray's 2016 trial. But the government did produce at trial a document that the IRS' Submission Processing Center sent to Ray in response to his letter. In that response, the IRS explained that it suspended Ray's electronic-filing privileges based on his failure to file IRS Form 8453.[5] The IRS eventually reinstated Ray's ability to electronically file returns in 2007.

According to Ray, his 2007 letter advised the IRS that he and his wife had done nothing wrong. Ray contends the letter's exculpatory nature was apparent in 2011 when the IRS destroyed the letter and that he couldn't obtain comparable evidence to present at trial. *See Trombetta*, 467 U.S. at 489. Ray's argument as to the exculpatory nature of the letter is not entirely clear. He contends,

> When a tax[-]return filing service like Cheapertaxes fail[ed] to file [Form 8453] for many, many, returns, it's a red flag for fraud that triggered an investigation and suspension of electronic[-]filing privileges. After investigation of the problem, the IRS concluded that not filing the form was excused, or, perhaps the IRS agreed the returns were true and correct. This is more than speculation that the [letter] was exculpatory.

---

[5] Form 8453 authorizes the direct deposit of a taxpayer's refund and requires the taxpayer and tax-preparer to attest that they reviewed and confirmed the return's accuracy.

Aplt. Br. 33.

As we read Ray's argument, he appears to suggest that the letter somehow demonstrates that he couldn't have committed tax fraud. But as the government points out, the IRS' response to Ray's letter shows that Ray's letter wasn't exculpatory. That response confirms that Ray's suspension stemmed from his failure to timely file IRS Form 8453—not from the fraud leading to Ray's convictions in this case. *See Trombetta*, 467 U.S. at 489. Thus, the letter and the IRS' reinstatement of Ray's electronic-filing abilities reflect Ray's correction of a record-keeping issue, not vindication that Ray filed truthful tax returns. And because the evidence wasn't exculpatory, we need not address Ray's argument that he lacked access to comparable evidence. *See Trombetta*, 467 U.S. at 489–90.

Alternatively, Ray alleges that even if the letter wasn't exculpatory, the government nevertheless violated his due-process rights because the letter was at least potentially useful to his defense and the government destroyed the letter in bad faith. *See Youngblood*, 488 U.S. at 58. But even if we assume that the letter was potentially useful to his defense, we find no evidence that the government destroyed the letter in bad faith. *See id.*

We consider five factors when determining whether the government destroyed or lost evidence in bad faith: (1) whether the government was on notice of the potentially exculpatory value of the evidence; (2) whether the potential exculpatory value of the evidence was based on more than mere speculation or conjecture; (3) whether the government had possession or the ability to control the disposition of

18

the evidence at the time it learned of the potential exculpatory value; (4) whether the evidence was central to the government's case; and (5) whether there's an innocent explanation for the government's failure to preserve the evidence. *See Bohl*, 25 F.3d at 911–12. Here, Ray satisfies none of these factors. For the reasons we discuss above, the letter had no potential exculpatory value—speculative or otherwise. Moreover, Ray didn't inform the government about the letter's alleged exculpatory value until three years after the IRS destroyed it pursuant to a standard destruction policy. Finally, the letter played no role in the government's case.

Ray's 2007 letter possessed no exculpatory value when the government destroyed it. *See Trombetta*, 467 U.S at 489. Further, there's no evidence the government destroyed the letter in bad faith. *See Youngblood*, 488 U.S. at 58. Accordingly, the district court didn't clearly err in finding that the government didn't violate Ray's due process rights by destroying the letter.

## V.    Amendment of the Indictment

Ray's final claim is that the district court violated his Fifth and Sixth Amendment rights when it constructively amended count 1 of the indictment in a manner that—according to Ray—broadened the charges against him. *See United States v. Hien Van Tieu*, 279 F.3d 917, 921 (10th Cir. 2002), *abrogated on other grounds by United States v. Little*, 829 F.3d 1177 (10th Cir. 2016). Our review is de novo. *See United States v. Zar*, 790 F.3d 1036, 1050 (10th Cir. 2015).

A constructive amendment occurs when there's a "possibility that the defendant was convicted of an offense other than that charged in the indictment."

19

*United States v. Apodaca,* 843 F.2d 421, 428 (10th Cir. 1988). Ray argues that district court created such a possibility here when it presented a slightly different version of the second superseding indictment to the jury at the opening of the trial. Because Ray's argument focuses on the distinctions between the original second superseding indictment and the slightly altered version the district court presented to the jury, we begin with a detailed description of the former and then explain how it differs from the latter.

The second superseding indictment included 36 criminal counts relevant to this issue. The first count charged Ray and his wife with conspiracy to defraud the United States. Counts 2 through 6 charged Ray individually with aiding and assisting in the preparation of false tax returns. And counts 7 through 36 charged Ray's wife individually with aiding and assisting in the preparation of false tax returns.

Within the first count, paragraphs 12 through 17 listed the overt acts allegedly performed in furtherance of the conspiracy. Paragraph 14 specifically incorporated the acts charged in counts 2 through 6. And paragraph 15 specifically incorporated the acts charged in counts 7 through 36. The acts incorporated in these two paragraphs appeared in a chart format under their respective counts.

At trial, when reading the indictment to the jury, the district court made a few alterations to the second superseding indictment. It replaced the name of Ray's wife with the phrase "another person," or something similar. R. vol. 6, 107. It also replaced the entirety of the text related to counts 7 through 36 (the counts against Ray's wife) with the word "omitted." *Id.* at 112. Then, for the first count, the district

20

court narrowed the number of overt acts allegedly performed in furtherance of the conspiracy. Specifically, although paragraph 15 in the second superseding indictment incorporated counts 7 through 36 as overt acts, the version of the indictment the district court read to the jury only included nine of those 29 overt acts.[6] In making this change, the district court removed the portion of the chart showing those nine overt acts from its original location in the second superseding indictment—as part of counts 7 through 36—and included it in paragraph 15, which set out the alleged overt acts related to count 1.

Ray argues that the altered indictment effectively alleged new overt acts by (1) excluding the name of his wife, (2) omitting the counts alleged against his wife, and (3) moving a chart illustrating the alleged overt acts to a new location in the amended indictment.

We disagree. It is common practice at trial to omit from an indictment information that's no longer relevant to the offenses—such as counts related to a codefendant who previously pleaded guilty. Thus, the district court didn't amend the indictment by substituting phrases like "another individual," R. vol. 6, 107, for Ray's wife's name, *see United States v. Miller*, 471 U.S. 130, 1356 (1985) ("A part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as 'a useless averment' that 'may be ignored.'" (quoting *Ford v. United States*, 273 U.S. 593, 602 (1927))). And the district court's decision to

_____

[6] The government selected those nine overt acts because it planned on using that subset at trial, rather than all 29 overt acts included in counts 7 through 36.

move part of the chart from counts 7 through 36 to paragraph 15 of count 1 didn't allege any new overt acts against Ray because the district court (1) copied the acts from one section of the indictment and moved them to another and (2) included fewer overt acts than those listed in the second superseding indictments. In fact, the district court actually *narrowed* the scope of the count, leaving no "possibility [Ray] was convicted of an offense other than that charged in the [second superseding] indictment." *Hien Van Tieu*, 279 F.3d at 921. Accordingly, we conclude the district court didn't constructively amend the indictment by reading a revised version of the second superseding indictment to the jury.

## Conclusion

Because the government never lodged a detainer with Colorado—thus rendering the IAD inapplicable—the district court did not abuse its discretion in denying Ray's motion to dismiss based on the IAD. The district court also properly rejected Ray's prosecutorial-vindictiveness argument because Ray failed to establish a presumption of vindictiveness. Further, Ray waived the specific STA claim he raises on appeal and, in any event, this claim fails on the merits. Ray's due-process claim also fails because he doesn't show that the destroyed evidence was exculpatory or that the government destroyed that evidence in bad faith. Lastly, the district court didn't constructively amend the indictment by slightly altering it before reading it to the jury. Accordingly, we affirm.

22