COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| RAUL LOPEZ, | § | No. 08-17-00240-CR |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | 34th District Court |
| THE STATE OF TEXAS, | § | |
| | | of El Paso County, Texas |
| Appellee. | § | |
| | | (TC# 20140D06162) |
| | § | |

## O P I N I O N

As a member of a street gang, Raul Lopez was indicted for three counts of engaging in organized criminal activity (EOCA), alleging underlying charges of assault and aggravated assault, against two victims, enhanced by two previous convictions. The charges also alleged that Lopez used or exhibited a deadly weapon, a firearm, during the commission of or during immediate flight from the offenses. The charges arose out of a beating and subsequent shooting that took place outside a bar where people had gathered to listen to music and raise funds for a charitable cause. The first EOCA-count alleged that Lopez, as a member of the Barrio Azteca street gang, committed aggravated assault against complainant Raul Morales. The second and third EOCA-counts alleged that Lopez, as a Barrio Azteca, committed aggravated assault and assault, respectively, against

complainant Carlos Bustillos.

The record established that both complainants were ex-members of the Barrio Azteca gang. Complainant Bustillos testified at trial, but Morales failed to appear. Lopez thus moved for a directed verdict on count one of the charges pertaining to Morales, which was not opposed by the State. The trial court entered a directed verdict on that count. Thereafter, the jury found Lopez guilty of the remaining two counts pertaining to charges committed against Bustillos. During the punishment phase, the jury found both enhancement paragraphs alleged on counts two and three to be true, and the jury assessed Lopez's punishment at 50-years' confinement and a $10,000 fine on count two, and 20-years' confinement and a $10,000 fine on count three. The trial court sentenced Lopez accordingly and ordered the sentences to run concurrently.

In multiple issues raised in this appeal, Lopez challenges pretrial rulings, evidentiary rulings, jury charge issues, as well as the legal sufficiency of the evidence to support the convictions. Mindful that we must first address those issues that could afford the greatest relief, we address Lopez's issues out of order from how they are listed by his briefing. Finding no error, we affirm the trial court's judgment.

## I. BACKGROUND

### A. The Fundraising Event at the Adventureros Bar

About 50 people were gathered at the Adventureros bar for a nighttime fundraising event to assist in paying the funeral costs of a young woman who had passed away from cancer. A longtime on-air radio broadcaster for radio station 92.3 KOFX and disc jockey, Mike Guerrero, played oldies for the attendees. Carlos Bustillos and Raul Morales were at the bar that evening with friends to include Lorenzo Palacios and others. All were ex-members of the Barrio Azteca

street gang. The Barrio Azteca gang is one of the major gangs in the El Paso area with an estimated 3,000 members. Ordinarily, joining the gang entails a lifetime commitment. As punishment for leaving the group, gang leaders are known to have demanded that current members assault or even kill ex-members on sight.

Raul Lopez, who was known by his moniker, "Garfield," was also at the bar that evening along with his wife, Maria Hernandez, and other members of the Barrio Azteca, including one member who went by the moniker of "Shy Boy." The event at Adventureros was going well until about 11 p.m. that evening. At that point, the evidence at trial produced two different accounts of the incident: one portraying Lopez as having no involvement in the assault on Bustillos or in a subsequent shooting; and another portraying Lopez as an aggressor who proceeded to viciously assault Bustillos before pulling out a gun then shooting while fleeing the scene. The State's presentation of evidence at trial in support of the charged offenses was complicated by a few factors: (1) Morales did not appear at trial; (2) Bustillos' trial testimony included responses that provided exculpatory information about Lopez; and, (3) a 911 caller, who had been at the bar that evening, testified at trial, but her trial testimony contradicted statements she had made in her call, as well as others she gave to police during their later investigation. Trial witnesses also included a detective familiar with the Barrio Azteca street gang who testified that witnesses are reluctant to testify in court against gang members due to the likelihood of being threatened or retaliated against.

## B. The Testimony from Complainant Bustillos and Other Witnesses

Bustillos testified that, at some point during the evening, he noticed one of his friends arguing with Lopez inside the bar. As Bustillos approached, Lopez asked him, "What the f*** are you doing here?" As a current member of Barrio Azteca, Lopez argued with Bustillos based on

3

Bustillos' status as an ex-member. Bustillos testified that he told Lopez, "Let's go throw down one-on-one," that Lopez agreed, and that the ensuing physical confrontation amounted to mutual combat. But once the two headed outside and Bustillos reached the doorway, he got knocked out without seeing who hit him. Bustillos also testified at trial that, alternatively, he remembered Shy Boy running towards him, hitting him, and then everything going black. He testified he did not see Lopez join in the assault. The next thing that Bustillos remembered was waking up on the ground, getting up, and running away from the bar towards the street. Bustillos was able to flee with his life but had injuries "[e]verywhere" on his face, eyes, mouth, neck, back, arms, and hand. Photos of his injuries were admitted into evidence.

Witnesses testified about an argument breaking out amongst multiple men with one of those men attempting to provoke a fight. Bar employees forced at least one patron to leave, and shortly thereafter, a fight began outside the front door. About 10 feet away from the door, two men were hitting and kicking a third man who was on the ground covering himself. One witness testified that the assault continued for a minute, at most, and, at the same time, someone called 911. As people were saying that police were coming, the two men who were hitting and kicking suddenly ran towards some cars at the park across the street from the bar and separated from each other. This witness also saw three or four people run over to a car at the park, saw someone open the car door, saw someone fire some shots, and saw the group drive away quickly. This witness recalled about 10 or more people being in the vicinity when the shots were fired but did not see where the person who had been assaulted on the ground had gone.

In his defense, Lopez also brought multiple witnesses to testify that he had been inside the bar when the shooting occurred and had not been involved in the fight outside the bar. Lopez's

4

wife, Maria, also testified that she saw a man across the street from the bar pull out a gun, but as the man pointed it at her, the gun appeared to have "got stuck." She was then able to flee to her car where, as she got inside, she heard about nine shots fired. From there, she called 911. While she was on the phone, Lopez and two of his friends, Eddie Mendoza and Robert Mercado, got into the car with her. Maria then drove off before officers stopped her car shortly afterwards.

## C. The Police Investigation and the Search of Lopez's Home 13 Days Later

Three 911 calls were placed within about a minute of each other and were admitted into evidence. Although one caller was unidentified, the other two calls were made by witness Corina Holguin and Lopez's wife, Maria Hernandez. In the anonymous call, the caller stated that he heard five or six gunshots, that he did not see who shot or if anyone got shot, and that everyone at the scene was running. In Holguin's call, she stated that there was a "gang-related" fight, that "everyone just started pulling guns out and shooting," and that "one of the guys who started it," although she did not know his name, "he was one of them that started shooting" and "he is called Garfield." In Maria's call, she stated that two men were shooting at the bar. At the end of Maria's 911 call, Lopez can be heard saying, "Are they running? Let's go get them."

Shortly after Maria drove away from Adventureros, El Paso Police Department Officers Maldonado and Gomez conducted a felony traffic stop on her vehicle because it matched a description broadcast over the police radio. After the four occupants exited the vehicle, they all gave the officers consent to search their persons and their vehicle, and the officers did not find any weapons, blood, or other evidence of a crime. None were arrested at that time for the fight or shooting at Adventureros. An inventory search was later performed on the vehicle, but no weapons were found.

5

Meanwhile, more than a dozen El Paso Police Department officers were dispatched to Adventureros. Multiple cars had been damaged and had bullet holes in them, and the bar itself had a bullet hole through its wall. Upon the officers' arrival, Bustillos' friend, Palacios, hesitantly waved over Officer Barajas and told him that an Azteca named Garfield "shot the place up" and left in a car, but once the officers contained the scene, other witnesses were evasive and said they did not know anything about what happened. In addition, the security cameras at Adventureros were not working that night. And, although the officers found two bullets and eight spent cartridges at the scene, as well as a gun at the foot of a tree across the street from Adventureros, the Texas Department of Public Safety Crime Laboratory in El Paso determined, based on caliber differences, that the bullets and cartridges did not come from the recovered gun. Furthermore, a defense expert testified that fingerprints found on the gun could not have been from Lopez, and even though an El Paso Police Department fingerprint expert initially testified that the fingerprints had no evidentiary value, he later agreed with the defense expert's conclusion.

Once the police reports from responding officers were available, Officer Chavez, an investigator for the gang unit of the El Paso Police Department, interviewed multiple witnesses, including Bustillos and Morales, and completed multiple photo lineups with some of those witnesses through which he confirmed that Lopez, Mercado, and Mendoza assaulted Bustillos. Thirteen days after the shooting at Adventureros, Officer Chavez obtained a search warrant for Lopez's apartment and executed it that same day with help from the SWAT team. Officers found Lopez and Maria inside the apartment and arrested them both. Officers also found various items indicating Lopez's high-ranking membership within the Barrio Azteca gang. Once officers took Lopez to the police station, Officer Chavez conducted a video-recorded interview with him.

6

However, Lopez denied shooting or assaulting anyone, denied knowing the names of the people with him on the night of the offense, and claimed he was not a member of the Barrio Azteca gang.

At trial, Detective Sanchez, a detective with the gang unit, testified in great detail about the origins and workings of the Barrio Azteca gang, including its illicit activities such as extortion, drug trafficking, and money laundering. From his experience, he explained to the jury that investigators encounter difficulties in getting witnesses to cooperate in "that they know that people that testify against Barrio Azteca are more likely going to get threatened and/or assaulted[.]" Detective Sanchez also testified that Lopez, Mercado, and Mendoza were confirmed members of the Barrio Azteca gang and that, through past investigations, he knew Lopez was a high-ranking member. Additionally, Detective Sanchez testified that joining the gang was a lifelong commitment, that the consequence for leaving the gang would be decided by someone of ranking membership, and consequences of leaving could range from assault up to murder.

### D. A Key Witness Recants Her Prior 911 Call and Written Statements

At trial, Corina Holguin—a witness from the bar who called 911—confirmed that she did not want to appear at trial and was present as a witness only because the State had served a subpoena to gain her attendance. Holguin testified that she saw Bustillos was drunk, belligerent, and "acting all pumped up" before he fought with Lopez. She also testified that everybody was fighting, and Bustillos had fallen and then gotten back up. When asked about ever seeing a gun pulled out, she answered "No."

Despite her trial testimony, Holguin had previously made a 911 call and she had given handwritten statements along with a signed typewritten statement prepared by Officer Chavez that told a different story. After Officer Chavez went to her home and took her to a police station where

she described that he "interrogated" her for "five hours practically[,]" Officer Chavez showed her three sets of photo lineups in which she identified Lopez, Mendoza, and Mercado, and handwrote brief statements describing how each had participated in the offense. In addition to her handwritten statements, Holguin also made a separate statement that was typed by Officer Chavez which she had signed. At trial, she testified that Officer Chavez pressured her to write and say what he wanted to hear, did not afford her an opportunity to read the typed statement, and told her that she needed to sign the typed statement in order to be released from the police station.

Although the trial court initially admitted Holguin's photo lineups, along with her handwritten statements, for impeachment purposes only, the court later ruled that they were admissible for *all purposes* as substantive evidence. More limiting, the trial court ruled that the content of Holguin's typewritten statement was admissible solely as impeachment evidence, and the court instructed the jury accordingly. On the lineup viewing form attached to the photo lineup on which Holguin picked out Lopez's photo by circling it, Holguin handwrote the following on a blank space for "Identification comments": "Garfield rushed out of Bar & superman punched Carlos & he fell to ground & Garfield & his friend started beating him up & then he pulled out gun." On the lineup viewing form for Mendoza, Holguin wrote the following comments: "This guy was also hitting & stomping on Carlos outside of the Bar. He hangs out w/ Garfield a lot." And on the lineup viewing form for Mercado, Holguin wrote, "This is the one that was beating up Carlos & He threw a bottle & [sic] Carlos friend[.] He's the one who ordered Carlos to leave Bar."

In Holguin's typewritten statement, she further described the assault in greater detail:

They were stomping his head and kicking his body and punching him in the face. [Bustillos] could not even get up and fight back . . . Garfield yelled at [Bustillos], "Get up motherfucker. You're not a badass now" . . . I saw Garfield pull out a gun from his front waist . . . Garfield raised and pointed at [Bustillos].

8

## II. ISSUES ON APPEAL

In this appeal, Lopez challenges his convictions in seven issues presented for review. Although we ultimately reach each of these issues, we do so out of order. We first address issues that would afford a party greater relief before reaching issues affording lesser relief. *See Benavidez v. State*, 323 S.W.3d 179, 182 (Tex. Crim. App. 2010); *see also Ex parte Reyes*, 474 S.W.3d 677, 681 (Tex. Crim. App. 2015).

In his second and third issues, which would require a reversal and rendition of a judgment of acquittal if meritorious, Lopez challenges the legal sufficiency of his convictions. Then, in his first issue that would require us to reverse and order a dismissal of his charges if meritorious, Lopez argues that the State violated Article IV of Texas Code of Criminal Procedure article 51.14 – the Interstate Agreement on Detainers Act (IADA) – by filing a detainer on him, subsequently filing a writ of habeas corpus *ad prosequendum* to procure his presence, and failing to bring him to trial within the mandated 120-day timeframe. And in the remainder of his issues four through seven that would require only a new trial if meritorious, Lopez argues the following: (4th Issue) the trial court erred by admitting Holguin's handwritten statement on the "Identification comments" section of her lineup viewing form for Lopez because they were inadmissible under Texas Rules of Evidence 801(e)(1)(C), 803, and 805; (5th Issue) the trial court erred by refusing his request to include a limiting instruction in the jury charge for Holguin's typewritten statement prepared by Officer Chavez; (6th Issue) the trial court erred by denying his motion to suppress evidence found at his home pursuant to the search warrant because the search warrant was, for multiple reasons, unsupported by probable cause; and (7th Issue) the trial court erred by admitting

9

Palacios' statements to Officer Barajas upon the officer's arrival to the scene because the statements were inadmissible under the Confrontation Clause.

The precise contentions of the parties will be discussed in more detail within our discussion of each issue.

## III. DISCUSSION

### A. Issues 2 and 3: Whether the Evidence was Legally Sufficient

In his second and third issues which we address together, Lopez challenges the legal sufficiency of the evidence to support his convictions for EOCA aggravated assault and EOCA assault, respectively, against Bustillos. Lopez narrows his sufficiency challenge as follows: "Specifically, there was no evidence that Appellant used a gun to threaten complainant with imminent bodily injury and there was no evidence that the complainant did not consent to the assault." He makes no other contentions to the sufficiency of the evidence on either count. The State responds that the evidence was legally sufficient to prove Lopez committed the two charged counts as either a primary actor or a party "where the evidence showed that he struck Bustillos over the head, joined Mercado and Mendoza in beating him, and then pulled out a gun and began shooting."

*1. Underlying Facts*

Lopez was indicted for three counts of engaging in organized criminal activity, as a member of the Barrio Azteca street gang, based on the following underlying acts: (1) aggravated assault against Raul Morales; (2) aggravated assault against Bustillos, without any specificity as to how it was committed; and (3) assault against Bustillos, also lacking any such specificity. The trial court granted a directed verdict on count one, and a jury found Lopez guilty of the remaining

10

two counts.

The jury charge included an instruction on party responsibility for both remaining counts and listed Mercado and Mendoza as the other potentially responsible parties. In addition, the charge included an instruction on a consent defense for the EOCA assault count.

*2. Standard of Review*

In assessing the legal sufficiency of the evidence to support a criminal conviction, we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The jury is the sole judge of the credibility of a witness's testimony and the weight to assign to that testimony, and the jury may believe all, some, or none of a witness's testimony. *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). The reviewing Court must give deference to the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. Each fact need not point directly and independently to the guilt of the defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Id*. Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Id*.

In reviewing the legal sufficiency of the evidence, we consider all the evidence admitted at trial, even improperly admitted evidence. *Moff v. State*, 131 S.W.3d 485, 488 (Tex. Crim. App. 2004). However, testimony admitted solely for impeachment purposes cannot be considered in

11

determining the sufficiency of the evidence to support the conviction. *See Flores v. State*, 48 S.W.3d 397, 404 (Tex. App. – Waco 2001, pet. ref'd); *Peters v. State*, 997 S.W.2d 377, 382 (Tex. App. – Beaumont 1999, no pet.).

*3. The Elements of the EOCA Offenses as Charged in the Indictment*

We measure whether the evidence presented at trial was sufficient to support a conviction by comparing it to the elements of the offense as defined by the hypothetically correct jury charge. *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id*.

According to the allegations in the indictment, the hypothetically correct jury charge authorized the State to prove the following elements for the EOCA assault count committed against Bustillos: (1) as a member of the Barrio Azteca criminal street gang; (2) Lopez; (3) intentionally, knowingly, or recklessly; (4) caused; (5) bodily injury; (6) to Bustillos. *See* TEX. PENAL CODE ANN. §§ 22.01(a)(1) (defining the offense of assault), 71.02(a)(1) (defining the offense of engaging in organized criminal activity); *Zuniga*, 551 S.W.3d at 735 (listing generic elements for EOCA offense under the hypothetically correct jury charge).

For the EOCA aggravated assault count, the hypothetically correct jury charge authorized the State to prove the above elements plus that Lopez "use[d] or exhibit[ed] a deadly weapon during the commission of the assault."[1] *See* TEX. PENAL CODE ANN. § 22.02(a)(1) (defining the

---

[1] In the parties' briefs, Lopez and the State offer competing frameworks for the elements that are at issue in our legal-sufficiency analysis for the EOCA aggravated assault conviction. The underlying "assault as defined in § 22.01" necessary for an aggravated assault can be a bodily-injury assault or threaten-with-imminent-bodily-injury assault.

12

offense of aggravated assault); *see also* TEX. PENAL CODE ANN. §§ 22.01(a)(1), 71.02(a)(1);

*Zuniga*, 551 S.W.3d at 735.

As relevant to the above-listed elements, bodily injury means physical pain, illness, or any

impairment of physical condition. TEX. PENAL CODE ANN. § 1.07(a)(8). In addition, a firearm is

per se a deadly weapon. TEX. PENAL CODE ANN. § 1.07(a)(17)(A).

And finally, as applied to Lopez's two charged counts, the law of parties allowed the jury

to hold him criminally responsible for the EOCA offenses if the jury found that Robert Mercado

or Eddie Mendoza committed those offenses and that Lopez, acting with intent to promote or assist

the commission of the offenses, solicited, encouraged, directed, aided, or attempted to aid the

others to commit the offenses. *See* TEX. PENAL CODE ANN. § 7.02(a)(2) (providing for criminal

responsibility for the conduct of another under the law of parties).

### 4. Application

#### i. The Evidence was Legally Sufficient to Support the EOCA Assault Conviction

---

*See* TEX. PENAL CODE ANN. §§ 22.01(a)(1), (a)(2), 22.02(a). In Lopez's brief, he frames the legal sufficiency inquiry as one where the State was required to prove aggravated assault by threat. However, the State asserts that the hypothetically correct jury charge here allowed the State to prove aggravated assault by use or exhibition of a deadly weapon during the commission of an assault causing bodily injury.

Seeming to support Lopez's interpretation of the proper sufficiency review on appeal, the jury charge instructed the jury to find Lopez guilty under only an assault-by-threat theory. By comparison, however, the indictment supports the State's assertion in that it alleged that Lopez "did then and there . . . commit the offense of aggravated assault against Carlos Bustillos" and did not specify whether the underlying assault was by bodily injury – per section 22.01(a)(1) – or by threat – per section 22.01(a)(2). *See* TEX. PENAL CODE ANN. §§ 22.01(a)(1), (a)(2), 22.02(a).

Here, the hypothetically correct jury charge authorized a conviction for aggravated assault with an underlying bodily-injury assault, as framed by the State. *See Swartz v. State*, 61 S.W.3d 781, 786 (Tex. App. – Corpus Christi 2001, pet. ref'd) (rejecting defendant's contention that the sufficiency of the evidence must be reviewed under the actual charge given to the jury and, instead, proceeding to analyze the sufficiency of the evidence under the standard of the hypothetically correct jury charge); *Jacques v. State*, No. 08-02-00491-CR, 2004 WL 1801202, at *7 (Tex. App. – El Paso Aug. 12, 2004, pet. ref'd) (not designated for publication) ("[W]hen an indictment has been presented that authorizes conviction on a particular ground and facts have been presented to a jury that are sufficient to convict on a particular ground, it is not necessary that the jury charge itself have specifically stated that ground in order for a conviction to be affirmed."). Accordingly, we will review Lopez's legal sufficiency issue under an analysis of whether the State proved an aggravated assault with an underlying bodily-injury assault. *See* TEX. PENAL CODE ANN. §§ 22.01(a)(1), 22.02(a)(2).

In this case, witnesses testified that an argument broke out inside Adventureros, that bar employees forced at least one patron to exit, that a fight began outside the front door, and that two men were hitting and kicking a third man who was on the ground and covering himself. Bustillos testified that he got knocked out once he reached the doorway of the bar. Photos of the injuries he had sustained "[e]verywhere" on his body were admitted into evidence. Furthermore, Holguin's handwritten statements on the photo lineups described a one-sided assault on Bustillos: Mercado was "beating up" Bustillos, Mendoza was "hitting & stomping on" Bustillos, and Lopez "superman punched" Bustillos, knocking him to the ground, and began "beating him up[.]" Finally, though undisputed in this appeal, Detective Sanchez testified that Lopez, Mercado, and Mendoza were members of the Barrio Azteca gang and that current members were motivated to punish ex-members through physical harm. Isolating these circumstances supporting the jury's verdict, the evidence was legally sufficient to prove the elements of Lopez's EOCA assault under a theory of both individual and party responsibility. *See* TEX. PENAL CODE ANN. §§ 22.01(a)(1), 71.02(a)(1); *Zuniga*, 551 S.W.3d at 735; *see also* TEX. PENAL CODE ANN. § 7.02(a)(2).

However, Lopez argues that the evidence was legally insufficient to support the jury's rejection of his consent defense on the EOCA assault count. For an effective-consent defense under Texas Penal Code section 22.06, the State does not have the burden of production – an affirmative duty to refute the defense claim – but, rather, the State satisfies its burden of persuasion simply by proving its case beyond a reasonable doubt and thereby disproving any evidence of the defense. *See* TEX. PENAL CODE ANN. § 22.06(a); *Bates v. State*, No. 01-19-00275-CR, 2020 WL 573253, at *2-3 (Tex. App. – Houston [1st Dist.] Feb. 6, 2020, no pet.) (mem. op., not designated for publication) (citing *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991)).

14

Despite Holguin's testimony that Bustillos incited the fight with Lopez and Bustillos' own testimony that he agreed to mutual combat, the jury was free to disregard such testimony and afford it no weight in determining whether the State proved its case. *See Metcalf*, 597 S.W.3d at 855 (holding that the jury may believe all, some, or none of a witness's testimony). Even if the jury was not so empowered, ample evidence contravened any narrative that the fight between Bustillos and Lopez was consensual. Bustillos testified that he invited Lopez to fight "one-on-one[,]" got knocked out as he stood at the doorway of the bar, remembered waking up on the ground, ran away, and sustained injuries "[e]verywhere" on his body from this interaction. Also, witnesses testified that they saw a man on the ground and covering himself while two other men were hitting and kicking him. Furthermore, Holguin's handwritten statements describe a one-sided confrontation in which Lopez, Mendoza, and Mercado perpetrated a savage beating on Bustillos. Based on this evidence, the jury was additionally free to resolve any conflicts in the evidence against an effective-consent defense under Texas Penal Code section 22.06 and to find, instead, that the State satisfied its burden of persuasion on the elements of Lopez's EOCA assault charge, as the jury evidently did by finding him guilty. *See* TEX. PENAL CODE ANN. § 22.06(a); *Bates*, 2020 WL 573253, at *2-3; *cf. Pierce v. State*, No. 04-02-00749-CR, 2003 WL 22715608, at *5 (Tex. App. – San Antonio Nov. 19, 2003, pet. ref'd) (mem. op., not designated for publication) (holding that the evidence showed the victim did not consent to being choked, grabbed, scratched, or knocked down despite the fact that, once the defendant went to punch the victim, the victim said, "Go ahead."). Therefore, we hold that the evidence was legally sufficient to support Lopez's conviction for EOCA assault, and we overrule his third issue presented for review.

*ii. The Evidence was Legally Sufficient for the EOCA Aggravated Assault Conviction*

15

We begin our analysis of this issue by first observing that we may not consider Holguin's typewritten statement in our sufficiency analysis because it was admitted solely as impeachment evidence. *See Flores*, 48 S.W.3d at 404; *Peters*, 997 S.W.2d at 382. Nonetheless, the State presented multiple sources of evidence that, in cumulation, amounted to legally sufficient evidence for Lopez's EOCA aggravated assault conviction.

First, Holguin stated in her 911 call that a gang-related fight broke out, that shooting began, and that "one of the guys who started shooting" was "called Garfield." Of course, the State presented evidence that Lopez was known by his moniker "Garfield." Second, Holguin's handwritten statement further explained that "Garfield rushed out of Bar & superman punched Carlos & he fell to ground & Garfield & his friend started beating him up & then he pulled out gun." And third, Palacios told arriving officers that Garfield "shot the place up" and left in a car. Considering the cumulative force of these observations from these multiple sources of evidence at trial, the jury could have reasonably concluded that Lopez assaulted Bustillos and subsequently pulled out a gun and began shooting. *See Hooper*, 214 S.W.3d at 13 (instructing that each fact need not point directly and independently to the guilt of the defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction). Thus, the evidence was legally sufficient to prove the elements of Lopez's EOCA aggravated assault under a theory of both individual and party responsibility. *See* TEX. PENAL CODE ANN. §§ 22.01(a)(1), 22.02(a)(1), 71.02(a)(1); *Zuniga*, 551 S.W.3d at 735.

Although Holguin testified at trial that she never saw Lopez pull out a gun, the jury was free to disbelieve her recantation at trial. *See Metcalf*, 597 S.W.3d at 855 (holding that the jury may believe all, some, or none of a witness's testimony). Furthermore, Detective Sanchez

16

explained at trial that witnesses are reluctant to testify against Barrio Azteca members because they know that people who do testify are more likely to be threatened or assaulted. This explanation provided a separate record-based reason for the jury to reject Holguin's testimony at trial that was less clear or otherwise aimed at distancing Lopez.

Therefore, we hold that the evidence was legally sufficient to support Lopez's conviction for EOCA aggravated assault, and we overrule his second issue presented for review.

## B. Issue 1: Whether the State Violated the Interstate Agreement on Detainers Act

In his first issue, Lopez contends that the State's actions in filing a detainer on him and subsequently filing a writ of habeas corpus *ad prosequendum* triggered the application of Article IV of article 51.14 of the Texas Code of Criminal Procedure and that the State's failure to bring him to trial within the 120-day timeframe set forth therein required that his pending charges be dismissed. The State responds that the timing of its filings matter and the timeline of those filings show that the IADA could not apply here. While not yet decided by any Texas appellate court, the State argues that "the protections of the IADA apply exclusively to prisoners who have been sentenced and are 'serving a term of imprisonment,' and not to prisoners in pretrial custody." Thus, the State argues that its detainer did not trigger the application of the IADA because Lopez was a pretrial detainee at the time the State filed its detainer. In support of its argument, the State points to out-of-state jurisdictions that have so held and asks this Court to follow those holdings.

### 1. Underlying Facts

Lopez filed a motion to dismiss his indictment under the IADA as enacted through Texas Code of Criminal Procedure article 51.14. In his motion, Lopez cited only to the procedures of Article IV of the Act as grounds for his requested dismissal. The trial court held a hearing on the

17

motion, and both parties stipulated to the following facts that would underlie the motion. After Lopez was indicted for commission of his charged offenses in the instant case, he was indicted on a federal case involving charges of conspiracy to commit racketeering and money laundering. In September 2014, Lopez was arrested and held in federal custody by the United States Marshal for the Western District of Texas through an arrangement at the El Paso County Jail. As the State recited at the hearing, a detention officer then "put a detainer" on Lopez giving notice that "in the event he makes federal bond or was released from his federal case for whatever reason, that he still had the pending state case that his PR bond had now been revoked on." In July 2015, Lopez pleaded guilty to his federal case. Prior to Lopez's sentencing, the State petitioned for two writs of habeas corpus *ad prosequendum* that were issued by the trial court in December 2015 and on February 4, 2016. On February 12, 2016, Lopez was sentenced to 10-years' confinement in federal prison. On February 16, 2016, Lopez was delivered as a United States prisoner from federal custody to State custody pursuant to a "Prisoner Remand or Order to Deliver" showing that a detainer had attached to him. Almost 18 months after his delivery to State custody, Lopez's trial began on August 14, 2017. The trial court entered an order denying Lopez's motion to dismiss.

### 2. Standard of Review

We review a decision on a motion to dismiss under the IADA for abuse of discretion. *United States v. Ray*, 899 F.3d 852, 857 (10th Cir. 2018). Any legal questions implicated by that conclusion are reviewed *de novo* and any factual findings for clear error. *Id.*; *see also Corral v. State*, No. 08-06-00270-CR, 2010 WL 1230555, at *3 (Tex. App. – El Paso Mar. 31, 2010, no pet.) (not designated for publication).

18

*3. Applicable Law*

The IADA is a congressionally sanctioned compact between the United States and the states that have adopted it. *See Alabama v. Bozeman*, 533 U.S. 146, 148 (2001) (citing 18 U.S.C. app. § 2). It outlines the cooperative procedure to be used between the states when one state is seeking to try a prisoner who is currently imprisoned in a penal or correctional institution of another state.[2] *State v. Votta*, 299 S.W.3d 130, 134-35 (Tex. Crim. App. 2009). Texas is a party to the IADA and has codified its provisions in Texas Code of Criminal Procedure article 51.14. *See* TEX. CODE CRIM. PROC. ANN. art. 51.14; *Votta*, 299 S.W.3d at 134-35.

The IADA's purpose is "to encourage the expeditious and orderly disposition of [outstanding] charges and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints," and its underlying rationale is that such charges and detainers "produce uncertainties which obstruct programs of prisoner treatment and rehabilitation." TEX. CODE CRIM. PROC. ANN. art. 51.14, art. I. Article IX of the IADA mandates that it "shall be liberally construed so as to effectuate its purposes."[3] *Id*. art. IX.

---

[2] "State" as used in the IADA includes the United States. *See* TEX. CODE CRIM. PROC. ANN. art. 51.14, art. II(a); *see also* 18 U.S.C. App. 2 § 2 (enacting the IADA).

[3] In *U.S. v. Ford*, the United States Court of Appeals for the Second Circuit discussed the "variety of problems arising out of the then unregulated system of detainers" that was marred by many "disadvantages and potential abuses" and that led to enactment of the IADA:

> The Detainers Act was originally drafted in response to a variety of problems arising out of the then unregulated system of detainers commonly used where one or more jurisdictions had charges outstanding against a prisoner held by another jurisdiction. Under that system, once one of the jurisdictions had tried and convicted him[,] the other jurisdictions, instead of trying him on their charges, would simply file detainers with the prison authorities holding him. The detainers would serve to notify the prison authorities that charges were pending against the prisoner elsewhere. Upon the prisoner's completion of the first prison term, the second jurisdiction could bring the defendant to trial on its own charges and, should a conviction be obtained, still other jurisdictions desiring to press charges might then file detainers with the prison where he was next incarcerated.

> The disadvantages and potential abuses of this system were many. Prison authorities often accorded

19

There are two ways by which the final disposition of a prisoner's untried matters may be sought under the IADA. *Corral*, 2010 WL 1230555, at \*4. Both of these provisions require that a detainer be lodged. *Id.*, at \*5. Generally speaking, a detainer is "a legal order that requires a [s]tate in which an individual is currently imprisoned to hold that individual when he has finished serving his sentence so that he may be tried by a different [s]tate for a different crime." *Bozeman* 533 U.S. at 148; *see also United States v. Mauro*, 436 U.S. 340, 359 (1978). Only the second possible scenario under Article IV is at issue in this appeal.

Article IV of the IADA provides the following:

> The appropriate officer of the jurisdiction in which an untried indictment, information, or complaint is pending shall be entitled to have a prisoner <u>against whom he has lodged a detainer and who is serving a term of imprisonment</u> in any party state made available in accordance with Paragraph (a) of Article V hereof <u>upon presentation of a written request for temporary custody</u> or availability to the appropriate authorities of the state in which the prisoner is incarcerated; provided that the court having jurisdiction of such indictment, information, or complaint shall have duly approved, recorded, and transmitted the request; and provided further that there shall be a period of 30 days after receipt by the appropriate authorities before the request be honored, within which period the governor of the sending state may disapprove the request for temporary custody or availability, either upon his own motion or upon motion of the prisoner.

---

detainers considerable weight in making decisions with respect to the terms and conditions of the prisoner's incarceration and release on parole. Sometimes the prisoner would automatically be held under maximum security. Sometimes he would be ineligible for special work programs, athletic programs, release for visits to relatives' death beds or funerals, or special minimum security facilities. Often detainers precluded the granting of parole. Despite these serious consequences, virtually any law enforcement officer[,] prosecutor, policeman, or judge could file a detainer without any procedural prerequisites. No pending indictment or other formal notification of charges was generally required. Indeed, it was estimated that as many as 50% of all detainers were allowed to lapse on the prisoner's release, without any attempts at prosecution by the jurisdiction that had filed the detainer. There were even cases in which the only reason the detainer had been filed was to increase the severity of the prisoner's sentence. Thus detainers imposed major unjustifiable hardships on prisoners, and, prior to adoption of the Agreement on Detainers, there was nothing a prisoner could do about them.

*U.S. v. Ford*, 550 F.2d 732, 737-39 (2nd Cir. 1977) [Internal citations omitted]; *see also Carchman v. Nash*, 473 U.S. 716, 730 n.8 (1985) (listing numerous detrimental effects that a detainer can have on a prisoner).

TEX. CODE CRIM. PROC. ANN. art. 51.14, art. IV(a) [Emphasis added]. Under Article IV, trial shall be commenced within 120 days of the arrival of the prisoner in the receiving state. *Id*. art. IV(c). If not, the trial court shall enter an order dismissing the pending indictment, information, or complaint with prejudice. *Id*. art. V(c).

In contrast to a detainer under Article IV, a writ of habeas corpus *ad prosequendum* is issued by a court, rather than prosecutors or law enforcement officers, and is immediately executed. *Mauro*, 436 U.S. at 360. A writ of habeas corpus *ad prosequendum* is not a detainer that triggers the provisions of the IADA. *Id*. at 361. However, a writ of habeas corpus *ad prosequendum* may be considered a "written request for temporary custody" as contemplated within the meaning of Article IV if a detainer was also filed. *Id*. at 361-62.

In accord with the out-of-state cases cited by the State in its brief, our own survey of opinions from other jurisdictions, both federal and state, reveals the following universal holding on the issue raised here: the IADA does not apply to pretrial detainees and thus a detainer filed prior to a prisoner's sentencing does not invoke the provisions of the IADA. *See, e.g., State v. Hargrove*, 45 P.3d 376, 383 (Kan. 2002) ("Application of all of the case law we have previously cited produces the following holdings in this case. Pretrial detainees are not under the protection of the Agreement. A detainer filed prior to sentencing is not one that effectively invokes the provisions of the Agreement."); *U.S. v. Currier*, 836 F.2d 11, 16 (1st Cir. 1987) (holding that a detainer did not trigger the prohibition of Article IV because the defendant had not yet begun serving his sentence at the time the detainer was issued); *see also, e.g., State v. Black*, 30 N.E.3d 918, 926 (Ohio 2015) ("Federal courts have uniformly held that the IAD applies only to prisoners who have begun serving their sentence of imprisonment and not to detainees who are awaiting the

21

disposition of their proceedings because, in part, pretrial detainees do not yet have an interest in rehabilitation programs.").

In one Court's survey of caselaw on the matter, the Court divined the following two rationales for this holding: (1) as a matter of policy, the purpose of the IADA is to minimize the adverse impact of foreign prosecution on rehabilitative programs of the confining jurisdiction, and neither a pretrial detainee nor a parole violator has a sufficient interest in the rehabilitative programs of his confining jurisdiction to justify invocation of the IADA; and (2) as a plain, facial reading of the statute reveals, articles III and IV apply to prisoners who are serving a "term of imprisonment" in a state which is a party to the IADA. *See U.S. v. Rodriguez*, No. CR-10-72-FVS-2, 2012 WL 6026271, at \*3 (E.D. Wash. Dec. 4, 2012) (Order Denying Mot. To Dismiss).

*4. Application*

Here, Lopez was held in federal custody at the time the State "put a detainer" on him and filed its two petitions for a writ of habeas corpus *ad prosequendum*. However, the detainer and two writs were all filed before Lopez was sentenced on his federal case and, thus, while he remained a pretrial detainee. Based on the universal agreement in holdings across out-of-state jurisdictions, and on the premise that article 51.14 of the Texas Code of Criminal Procedure was codified from the IADA to which Texas adheres as a party state, we likewise adopt the well-reasoned holding that a detainer filed prior to a prisoner's sentencing does not invoke the provisions of the IADA because the Act does not apply to pretrial detainees, and we hold here that neither the detainer nor the two petitions for a writ of habeas corpus *ad prosequendum* that were filed to procure Lopez's appearance in state custody triggered the application of article IV of the IADA. *See, e.g., Hargrove*, 45 P.3d at 383; *Currier*, 836 F.2d at 16; *see also, e.g., Black*, 30 N.E.3d at 926.

22

Therefore, the trial court did not abuse its discretion in denying Lopez's motion to dismiss based on a lack of compliance with Article IV of Texas Code of Criminal Procedure article 51.14. Accordingly, we overrule Lopez's first issue presented for review.

## C. Issue 4: The Admissibility of Holguin's Handwritten Statements

In his fourth issue, Lopez argues that the trial court abused its discretion by admitting Holguin's handwritten statements on the "Identification comments" section of her lineup viewing form. In three sub-parts to his issue, he argues that the statements were inadmissible for the following reasons: (1) they did not qualify as prior statements of identification under Texas Rule of Evidence 801(e)(1)(C), as only Holguin's mere identification alone, rather than what she observed Lopez doing, was admissible under that rule; (2) they were likely to confuse the jury under Texas Rule of Evidence 403; and (3) they were hearsay-within-hearsay with no hearsay exceptions being shown by the State for each layer as required under Texas Rule of Evidence 805.

The State responds that Holguin's handwritten statements were admissible under Rule 801(e)(1)(C) because the statements constituted only a brief, indispensable description of her identification that allowed the jury to understand the meaning of her identification of Lopez in the photo lineup. In addition, the State argues that any error was harmless. And while the State notes that Lopez failed to lodge an objection based on Rule 403, the State does not address either of Lopez's Rule 403 or hearsay-within-hearsay arguments with any substantive response on the merits.

### 1. Underlying Facts

At trial, Holguin testified that the information she relayed to the 911 dispatcher was based on things other people were telling her. In addition, Holguin testified at trial that the typed

23

statements were not things that she directly observed and that she overheard others "saying that it was Garfield shooting." She did not similarly testify regarding her handwritten statements on her photo identification of Lopez.

During trial, the State sought admission of Holguin's handwritten statements under the hearsay exclusion for statements of prior identification in Texas Rule of Evidence 801(e)(1)(C). Lopez objected on the bases that Holguin's handwritten statements were inadmissible under Rule 801(e)(1)(C) and that they contained hearsay within hearsay. He did not object on the basis of Texas Rule of Evidence 403. The trial court overruled Lopez's objections.

*2. Standard of Review*

We review a trial court's ruling on the admissibility of evidence under an abuse of discretion standard. *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016). Under this standard, the trial court's ruling will be upheld so long as it was within the zone of reasonable disagreement. *Id*. If the ruling is correct under any applicable theory of law, it will not be disturbed even if the trial court gave the wrong reason for the right ruling. *Id*.

*3. Admissibility under Rule 801(e)(1)(C)*

*i. Applicable Law*

Hearsay is a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). A statement is not hearsay if the declarant testifies at trial, the declarant is subject to cross-examination concerning the statement, and the statement is one of identification of a person made after perceiving that person. TEX. R. EVID. 801(e)(1)(C); *see also Delacerda v. State*, 425 S.W.3d 367, 390 (Tex. App. – Houston [1st Dist.] 2011, pet. ref'd).

24

In *Delacerda*, the First Court of Appeals addressed the precise issue raised in our appeal: whether a witness's out-of-court statements, made while viewing a photospread, that described the actions of an identified individual were admissible under Rule 801(e)(1)(C), as opposed to mere identification alone. *Delacerda*, 425 S.W.3d at 389-90. *Delacerda* involved a drive-by-shooting murder in which the State sought to prove that the defendant, as a passenger in the cab of a pickup truck, was the shooter. *Id*. at 373-78. At trial, the victim's brother testified that he did not remember identifying another individual as being in the back of the pickup truck, and thus not the shooter, when he was shown a photospread by police. *Id*. at 374. The State then sought to admit the brother's prior identification of the person in the bed of the truck along with his statement, made during the identification process, that the individual was lying in the bed of the truck and not the shooter. *Id*. at 391-92.

The *Delacerda* Court observed that no Texas Court had yet addressed the scope of the identification exclusion to the hearsay rule and whether the rule encompasses not merely the declarant's previous identification but also the declarant's statements regarding what he observed the identified person doing. *Id*. at 390. Looking to guidance from out-of-state jurisdictions that discussed Federal Rule of Evidence 801(d)(1)(C), the federal counterpart to Texas's Rule 801(e)(1)(C), the Court observed that the federal rule was "intended to solve the problem of a witness who identifies a defendant before trial, but then at trial refuses to acknowledge the identification because of fear of reprisal." *Id*. at 390. The Court then examined the holdings of the Illinois Supreme Court and the District of Columbia Court of Appeals that such a rule contemplated the admission of both a witness's bare identification and the witness's statements regarding what he saw the identified person doing in order to fully inform the jury about the

25

reliability of the witness's identification and to make the identification understandable to the jury:

> The Illinois Supreme Court, in construing a statutory exclusion to the hearsay rule substantively identical to Federal Rule 801(d)(1)(C) and Texas Rule 801(e)(1)(C), rejected an interpretation that would limit admissible testimony under the statute solely to the "actual identification" of a person, reasoning instead that "construing 'statements of identification' to include the entire identification process would ensure that a trier of fact is fully informed concerning the reliability of a witness' identification, as well as the suggestiveness or lack thereof in that identification." Similarly, the District of Columbia Court of Appeals has held, under its substantively identical exception, that although "detailed accounts of the actual crime" are not admissible, the declarant's "description of the offense itself is admissible under this exception only to the extent necessary to make the identification understandable to the jury."

*Delacerda*, 425 S.W.3d at 390-91 [Internal citations omitted]. Agreeing with the rationale of those Courts, the *Delacerda* Court held that limiting admissible testimony under the identification exclusion to the hearsay rule solely to the declarant's naming of the identified individual and not allowing testimony regarding what the declarant identified the individual as doing is "unduly restrictive." *Id*. at 392. The Court ultimately ruled that, "[u]nder these facts," the brother's statement that the person he identified was the person he saw in the back of the truck and not the shooter was "an indispensable part of his 'statement of identification.'" *Id*. at 393.

Following the path tread by the *Delacerda* Court, our sister Fourteenth Court of Appeals also held that Rule 801(e)(1)(C) extended to statements describing what an identified individual was doing. *See Price v. State*, 502 S.W.3d 278, 286 (Tex. App. – Houston [14th Dist.] 2016, no pet.) (following the rationale in *Delacerda* and holding that the exclusion from the hearsay rule in Rule 801(e)(1)(C) "extends to other statements [the witness] made to [an officer] during the identification, such as his description of appellant's role in the robbery."). And despite foregoing an in-depth analysis of Rule 801(e)(1)(C), this Court has previously adhered to this same rationale. *See Diaz v. State*, No. 08-10-00068-CR, 2011 WL 6145120, at *3 (Tex. App. – El Paso Dec. 7,

2011, no pet.) (not designated for publication) (where this Court held that Rule 801(e)(1)(C)'s scope extended to a victim's statements identifying the defendant as her assailant and describing the manner of his assault).

### ii. Application

Although Lopez graciously acknowledges the holding in *Delacerda*, he argues that the *Delacerda* Court's holding failed to put any limiting parameters on the scope of Rule 801(e)(1)(C) and that the amount of admissible detail within a statement of identification "is vague and completely undefined as currently interpreted[.]" While we also perceive that the rationale of *Delacerda* does not provide the precise outer contours for admissibility under the rule, we find it unnecessary here to define those contours or to determine whether such contours are needed for Rule 801(e)(1)(C).

First, we observe that Holguin's written identification statement serves to inform the jury about its reliability and to make Holguin's identification of Lopez understandable. The *Delacerda* Court identified both functions, perused from the holdings of other jurisdictions, as justifications for permitting a statement regarding what a witness saw an identified person doing, rather than simply a bare identification, under Rule 801(e)(1)(C). *Delacerda*, 425 S.W.3d at 390-91. But more importantly, we observe that Holguin's handwritten statements were short and brief, where they relayed only the most bare information necessary to describe Lopez's assaultive actions against Bustillos—and were indispensable to the jury's understanding of her identification of Lopez in a photo lineup—where Holguin identified through photo lineups two other individuals who were engaged in assaultive actions against Bustillos, as well. For all of the above reasons, we do not see this case as one in need of any sort of mathematically precise limiting principle for its resolution,

27

as the content of the statements at issue here comply with the justifications articulated for their admission under the rule.

Therefore, we hold that Holguin's statements were admissible under Rule 801(e)(1)(C) where she identified Lopez in a photo lineup and where she handwrote, on a blank space for "Identification comments[,]" that "Garfield rushed out of Bar & superman punched Carlos & he fell to ground & Garfield & his friend started beating him up & then he pulled out gun." *See Price*, 502 S.W.3d at 285-86 (holding that the following testimony from an officer about a witness's statement made during an on-the-scene identification of the defendant was admissible as an exclusion from the hearsay rule under Rule 801(e)(1)(C): "He stated [the defendant] was the suspect with the gun, with the shotgun."); *Diaz*, 2011 WL 6145120, at *2-3 (where this Court held that the trial court did not abuse its discretion in admitting as an exclusion from the hearsay rule under Rule 801(e)(1)(C) the victim's statements, made during an identification of the defendant, that the defendant was her husband, that he was the individual who assaulted her, and that he was responsible for the injuries on her face); *Delacerda*, 425 S.W.3d at 393 (holding that a witness's statement, made during a photospread identification, that the person he saw was "in the back of the truck and not [ ] the shooter" was admissible as a statement of identification under Rule 801(e)(1)(C)). The trial court's admission of Holguin's handwritten statements under this rule was thus not an abuse of discretion, and we overrule this first sub-part to Lopez's fourth issue presented for review.

### 4. Admissibility under Rule 403

To preserve a complaint for appellate review, a party must timely object and state the specific grounds for the ruling sought. TEX. R. APP. P. 33.1(a)(1)(A). While Lopez lodged

objections to Holguin's handwritten statements on multiple bases at trial, he did not object on the specific basis of Rule 403. Thus, we hold that any Rule 403 complaint is not preserved for our review in this appeal. *See* TEX. R. APP. P. 33.1(a)(1)(A); *see also, e.g., Rodriguez v. State*, No. 08-17-00177-CR, 2019 WL 2710246, at *6 (Tex. App. – El Paso June 28, 2019, pet. ref'd) (not designated for publication) (holding that the defendant's Rule 403 complaint was not preserved for appellate review where the defendant did not object on that basis). And we consequently overrule this second sub-part to Lopez's fourth issue.

### 5. Admissibility under Rule 805

#### i. Applicable Law

Hearsay is generally inadmissible, except as provided by statute or rule. TEX. R. EVID. 802. However, even hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule. TEX. R. EVID. 805. The trial court, as gatekeeper, resolves any preliminary question related to the applicability of the hearsay rules. *See* TEX. R. EVID. 104(a) ("The court must decide any preliminary question about whether . . . evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege."); *see also Coble v. State*, 330 S.W.3d 253, 294 (Tex. Crim. App. 2010); *Johnson v. State*, No. 01-18-00446-CR, 2019 WL 758329, at *2 (Tex. App. – Houston [1st Dist.] Feb. 21, 2019, no pet.) (mem. op., not designated for publication). The trial court may consider the statement itself in resolving the question of admissibility. *Coble*, 330 S.W.3d at 294; *Johnson*, 2019 WL 758329, at *2.

#### ii. Application

Here, Lopez contends that "because Holguin explained that her statements on the lineups

were not matters that she witness[ed] herself, they contained two levels of hearsay" and that "[t]he State did not provide any plausible explanation to get past the second level of hearsay." As an initial matter, we note that Holguin testified only that the information she relayed to the 911 dispatcher, and through her typed statement, were things other people had told her. Regarding the contents of her handwritten identification statements, in contrast, she did not testify that these handwritten statements were based on things she did not directly observe. For this reason alone, we would overrule this third sub-part of Lopez's issue.

But even assuming that Holguin had testified that her handwritten statements were based on hearsay, the trial court essentially would have been faced with a situation of conflicting evidence where Holguin testified after-the-fact that her handwritten statements were based on hearsay and where Holguin's writing itself provides no indication that her assertions were not based on direct observations. *See Coble*, 330 S.W.3d at 294; *Johnson*, 2019 WL 758329, at *2 (holding that the trial court may consider the statement itself in resolving the question of admissibility). And, as the gatekeeper for resolving any preliminary question related to admissibility, the trial court was free to resolve the conflict in favor of determining that Holguin's handwritten statements were not based on hearsay. *See* TEX. R. EVID. 104(a); *Coble*, 330 S.W.3d at 294; *see also Johnson*, 2019 WL 758329, at *4-5 (holding that the trial court, as the fact finder on the preliminary question of admissibility, was entitled to resolve inconsistencies in the witness's testimony and to believe that she was gathering information for the purpose of medical treatment for the medical-diagnosis-or-treatment hearsay exception where, even though the witness first testified that she was not gathering information to be used for a medical purpose, the witness later testified that she was gathering information for the physician to use for the purpose of treating a

30

patient); *Pina v. State*, 38 S.W.3d 730, 736-37 (Tex. App. – Texarkana 2001, pet. ref'd) (holding that the trial court, as the arbiter of preliminary questions concerning the admissibility of evidence, did not abuse its discretion in overruling the defendant's hearsay objections to a witness's testimony even where her testimony was contradictory at times – e.g., she testified both that she heard the defendant tell his mother that he killed a man and was trying to escape and also testified that she did not hear the defendant tell his mother anything).

Thus, Holguin's handwritten statements were not implicated by Texas Rule of Evidence 805 because the statements contained only one layer of potential hearsay. *See* TEX. R. EVID. 805. Accordingly, the State had to show only that Holguin's handwritten identification statement itself was not inadmissible hearsay. *See* TEX. R. EVID. 802. As discussed above, her handwritten statement was excluded under Rule 801(e)(1)(C) from the rule against hearsay, and the trial court therefore did not abuse its discretion by ruling that Holguin's handwritten statement was admissible over Lopez's hearsay-within-hearsay objection. Therefore, we overrule Lopez's third and final sub-point in his fourth issue.

**D.  Issue 5: The Absence of a Limiting Instruction in the Jury Charge**

In his fifth issue, Lopez argues that the trial court erred by refusing his request to include a limiting instruction in the jury charge for the impeachment evidence that was admitted at trial, namely, Holguin's typewritten statement prepared by Officer Chavez.

The State responds that: (1) the trial court did not err where it included an instruction in the charge that reminded the jury to follow all previous instructions given throughout the trial and where the court gave a thorough limiting instruction to the jury prior to the State's impeachment of Holguin with her typewritten statement; and (2) any error was harmless both for the same

31

reasons given in its merits argument and for the reason that the content of Holguin's typewritten statement was the same as the content of her handwritten identification statements and her 911 call. We need not decide whether the trial court erred here because we rest our resolution of this issue on a harm analysis.

*1. Underlying Facts*

Before Holguin was impeached with her typewritten statement, Lopez requested a limiting instruction. The trial court gave an extensive limiting instruction to the jury that "impeach[ment] evidence" was "for the purpose of you determining credibility" and that "[i]t's not for the truth of the matter asserted[,]" and the trial court incorporated multiple requests from Lopez in its instruction:

| | |
|---|---|
| [Trial court]: | Ladies and gentlemen, the prosecutors are now going over what we call impeaching evidence. Evidence that is for impeachment is for the purpose of you determining credibility of testimony. As I told you yesterday, when somebody says one thing at one time and may say something different at another time, you have to evaluate the credibility of that. Not necessarily -- not the truth of it, but the credibility of their testimony. That's why it's being offered for impeachment. To impeach is to say, "Didn't you say, previously, X?" so that you can then determine if you believe her then or now. |
| [Defense counsel]: | Could the Court instruct the jury that it's not -- what may have been said in any prior statement is not offered as evidence itself? |
| [Trial court]: | Right. It's not for the truth of the matter asserted. It is, as I said, to determine her credibility and believability. Okay? So go ahead. |
| [Defense counsel]: | Can I have -- can the jury be -- just so I don't have to keep getting up, I'm trying to cover all the bases -- any questions that are asked regarding -- |

| [Trial court]: | Yes. Anytime in this trial that you hear -- and it would be even if they -- even if the defense is asking questions of witnesses -- about "Didn't you say previously" this or that, that is always introduced simply to impeach and not for the truth of the matter asserted. Simply for is it -- "Are you telling the truth now, or [were] you telling the truth then?" "Were you mistaken then, or [are] you mistaken now?" It's always for that. |
|---|---|

Later in the trial when the State questioned Holguin about her handwritten identification statements but before the trial court ruled that her handwritten statements were admitted for substantive purposes, the trial court remined the jury that "[j]ust to refresh, what you're about to see, again, is for impeachment purposes only, as I've previously discussed it with you."

During the jury charge conference, Lopez requested that the trial court include in the charge "another detailed instruction regarding the fact that matters that were submitted for impeachment purposes are not to be used for the truth of the matter asserted but simply to judge the credibility of the witness." The trial court overruled his request. However, the trial court included the following instruction on the matter:

> During the trial of this case, the Court gave you certain limiting instructions. You shall continue to follow those same instructions during your entire deliberations.

*2. Standard of Review*

Claims of jury-charge error are reviewed under a two-pronged test. *See Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015). Our first inquiry is whether the jury charge contained error. *Id*. If error exists, we then analyze the harm resulting from the error. *Id*.

Any error in the jury charge is subject to a harmless-error analysis. *Chambers v. State*, 580 S.W.3d 149, 154 (Tex. Crim. App. 2019). If the defendant timely objected at trial to the jury-

33

charge error, the reviewing Court will reverse upon a showing of "some harm" to the defendant. *Id*. This means that the presence of any harm, regardless of degree, is sufficient to require a reversal. *Id*. Yet, the defendant must have suffered "some actual–rather than merely theoretical–harm." *Id*.

*3. Applicable Law*

Limiting instructions are governed by Texas Rule of Evidence 105, and this rule provides that "[i]f the court admits evidence that is admissible against a party or for a purpose--but not against another party or for another purpose--the court, on request, must restrict the evidence to its proper scope and instruct the jury accordingly." TEX. R. EVID. 105(a). Thus, a limiting instruction complies with Rule 105 where it restricts the jury's use of particular evidence so that it is considered only for its limited purpose. *See Walker v. State*, 300 S.W.3d 836, 851 (Tex. App. – Fort Worth 2009, pet. ref'd); *Flores v. State*, Nos. 01-10-00531-CR, 01-10-00532-CR, 01-10-00534-CR, 2013 WL 709100, at *25-26 (Tex. App. – Houston [1st Dist.] Feb. 26, 2013, pet. ref'd) (mem. op., not designated for publication). For impeachment evidence, that limited purpose is to determine the credibility of the witness sought to be impeached. *See Walker*, 300 S.W.3d at 851; *Flores*, 2013 WL 709100, at *25-26. A limiting instruction should be given, if requested, both when the evidence is admitted and then again at the final jury charge. *See Ex parte Varelas*, 45 S.W.3d 627, 631 (Tex. Crim. App. 2001) (observing that the trial court errs in not giving a limiting instruction if requested by a defendant at the time evidence is admitted); *see also Delgado v. State*, 235 S.W.3d 244, 251 (Tex. Crim. App. 2007) (observing that a limiting instruction should be given in the jury charge if the defendant requested a limiting instruction at the time the evidence was first admitted).

Despite the requirement that a trial court give an additional limiting instruction in the jury charge, essentially as a reminder of its earlier mid-trial instruction, Courts have often recognized that juries are presumed to follow the trial court's instructions. *See, e.g., Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985) ("The Court presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them."); *Archie v. State*, 340 S.W.3d 734, 741 (Tex. Crim. App. 2011) (observing that the law generally presumes a trial court's instructions to a jury will be duly obeyed). This presumption that the jury will follow the trial court's instructions will be abandoned only if there is some evidence establishing that the jury failed to do so. *See Williams v. State*, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996).

Furthermore, a trial court's failure to give the precise jury-charge instruction requested by a defendant is harmless where a substantially similar charge instruction is given. *See Todd v. State*, 911 S.W.2d 807, 819 (Tex. App. – El Paso 1995, no pet.) (where this Court held that the trial court's refusal to include in its jury charge the particular language the defendant requested was harmless where "the charge given contains substantially similar language to that requested by [the defendant]"); *Borrego v. State*, No. 11-97-00080-CR, 1997 WL 33804169, at *1 (Tex. App. – Eastland Nov. 20, 1997, no pet.) (not designated for publication) ("The instructions in the jury charge provided the same guidance as that requested by appellant. When a refused charge is substantially the same or is adequately covered by the charge given, there is no harm in failure to give the refused charge."); *accord Thompson v. State*, No. 14-10-00343-CR, 2011 WL 2176507, at *3-4 (Tex. App. – Houston [14th Dist.] June 2, 2011, pet. ref'd) (mem. op., not designated for publication); *Halk v. State*, No. 01-97-00560-CR, 1999 WL 504187, at *5 (Tex. App. – Houston

[1st Dist.] July 15, 1999, no pet.) (not designated for publication) (cases holding that there was no error where the trial court refused to include in its jury charge the specific language the defendant requested but ultimately gave a substantially similar charge).

*4. Application*

Even assuming the trial court erred by refusing Lopez's request to include "another detailed" limiting instruction in its charge, we hold that any error was harmless. When the State sought to impeach Holguin with her typewritten statement, Lopez requested a limiting instruction, and the trial court obliged with an extensive limiting instruction that incorporated multiple requests by Lopez. The trial court also made sure to "refresh" the jury on its prior limiting instruction at a later point during trial in which the State impeached Holguin. And we observe that the trial court's extensive mid-trial limiting instruction constituted a proper limiting instruction because it informed the jury that it should restrict any use of the evidence to "the purpose of you determining credibility" and "not for the truth of the matter asserted." *See Walker*, 300 S.W.3d at 851; *Flores*, 2013 WL 709100, at *25-26.

The trial court then included in its jury charge an instruction for the jury to follow the limiting instructions given during the trial of the case. Thus, the jury received an instruction that had a substantially similar effect to the precise instruction requested by Lopez, and any failure by the trial court to give that precise instruction was harmless. *See Todd*, 911 S.W.2d at 819; *Borrego*, 1997 WL 33804169, at *1; *accord Thompson*, 2011 WL 2176507, at *3-4; *Halk*, 1999 WL 504187, at *5.

Lopez argues that the trial court's mid-trial limiting instructions were "confusing" and that "[g]iven the length of the trial and the 6 days between the time of the instructions and the closing

36

arguments, it is unlikely the jury would remember the instruction." In addition, Lopez contends that "the jury must have relied on the threats conveyed in Holguin's prior inconsistent statements" because "[t]his was the only way the State was able to present evidence that would arguably support the aggravated assault charge against Bustillos." However, we must presume that the jury followed the trial court's mid-trial and charge instructions in the absence of contrary evidence. *See Williams*, 937 S.W.2d at 490; *see also Chambers*, 580 S.W.3d at 154 (observing that, even under the heightened harm standard for objected-to jury charge error, the defendant must have suffered "some actual–rather than merely theoretical–harm").

Therefore, we hold that any error in the trial court's refusal to include a detailed limiting instruction in its jury charge was harmless. Consequently, we overrule Lopez's fifth issue presented for review.

### E.  Issue 6: Whether the Search Warrant for Lopez's Apartment was Valid

In his sixth issue, Lopez argues that the trial court erred by denying his motion to suppress evidence obtained pursuant to the search warrant executed on his apartment. Specifically, he contends that the warrant should not have been issued where the facts contained within the four corners of Officer Chavez's supporting affidavit were insufficient to show probable cause that evidence of Lopez's charged offenses would be found on the premises 13 days after the shooting at Adventureros. The State responds that the issuing magistrate could have reasonably concluded, under the totality of the circumstances, that there was a fair probability that evidence of Lopez's charged EOCA offenses would be located at his apartment.

Aside from these arguments on the merits, neither party in this appeal provides substantive analysis on how we should address any harm here. Lopez's argument on harm consists of the

following two sentences: "The State introduced all of [the evidence found pursuant to the warrant] at trial and the jury took this evidence into consideration in finding Lopez guilty of EIOCA. Without the illegally obtained evidence, especially the 'hit list,' a substantial likelihood exists that Lopez would not have been found guilty of EIOCA, aggravated assault." The State failed to address – or even mention – a harmless-error analysis at all.

Even if the trial court abused its discretion in denying Lopez's motion to suppress, we would still be required to perform a harm analysis. *See Lake v. State*, 532 S.W.3d 408, 416-17 (Tex. Crim. App. 2017) (plurality op.) (observing the "policy" of Texas appellate courts to generally require a harm analysis except only where the United States Supreme Court has expressly eschewed it); *Newbrough v. State*, 225 S.W.3d 863, 867 (Tex. App. – El Paso 2007, no pet.) (instructing that, if error is found in the admission of evidence obtained in violation of the Fourth Amendment, a reviewing Court must conduct a harm analysis to determine whether the error calls for reversal of the judgment). And as we can resolve this issue based on a harm analysis, we will assume without deciding that the trial court erred and proceed directly to that analysis.

*1. Underlying Facts*

Based on Officer Chavez's search warrant, Lopez filed a motion to suppress all evidence seized from his apartment on the basis that the warrant was invalid under the Fourth Amendment. The trial court held a hearing on the motion, and after reviewing a copy of the search warrant that incorporated Officer Chavez's supporting affidavit, the trial court denied Lopez's motion. Inside Lopez's apartment, officer found multiple gang-related items, and Detective Sanchez testified at trial about their significance. First, the officers found a poster depicting Aztec culture. Detective Sanchez testified that Barrio Azteca members used such motifs or symbols to indicate their

38

membership. The officers also found a piece of notebook paper stuck in the bowl of the bathroom toilet that had a list of Barrio Azteca member names, along with their prison or jail number, written on it. Detective Sanchez testified that high-ranking Barrio Azteca members used those lists to determine whose commissary accounts the gang would place money into. In addition, a similar list of Barrio Azteca member names, including those of Mercado and Mendoza, were found on some sheets of notebook paper in Lopez's closet. Finally, the officers found a third list of names that included Bustillos' name, his moniker, his hometown, and his Texas Department of Corrections number. Detective Sanchez testified that this was a list of "muletas" or ex-members and that only a high-ranking gang member in charge of an area would possess such a list.

### 2. Harm Analysis for Constitutional Error

We review the harm resulting from a trial court's erroneous denial of a motion to suppress evidence obtained in violation of the Fourth Amendment under the constitutional harmless-error standard of Texas Rule of Appellate Procedure 44.2(a). *See* TEX. R. APP. P. 44.2(a); *Hernandez v. State*, 60 S.W.3d 106, 108 (Tex. Crim. App. 2001). Under Rule 44.2(a), we must reverse the conviction unless we conclude "beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a). This Court has previously observed that we begin our analysis under this standard presuming reversal is required and that the burden is on the State to show the error is harmless. *See Morris v. State*, 554 S.W.3d 98, 124 (Tex. App. – El Paso 2018, pet. ref'd).

Factors a court may consider in assessing harm under Rule 44.2(a) include the nature of the error, whether it was emphasized by the State, the probable implications of the error, and the weight the jury would likely have assigned to the error. *Snowden v. State*, 353 S.W.3d 815, 822

39

(Tex. Crim. App. 2011). However, these factors are not exclusive. *Morris*, 554 S.W.3d at 124. There is no set formula for conducting a harm analysis that necessarily applies across the board to every case and every type of constitutional error. *Snowden*, 353 S.W.3d at 822 n.31. Furthermore, both this Court and our sister Courts have held, simply, that the erroneous admission of evidence is harmless under Texas Rule of Appellate Procedure 44.2(a) where it is cumulative of other evidence admitted at trial. *See Hamrick v. State*, No. 08-02-00091-CR, 2004 WL 1078495, at *3 (Tex. App. – El Paso May 13, 2004, pet. ref'd) (not designated for publication) (where this Court held that erroneous admission of evidence was harmless under Rule 44.2(a) where it was cumulative); *see also Ellison v. State*, 494 S.W.3d 316, 328-29 (Tex. App. – Eastland 2015, pet. ref'd) (holding that erroneous admission of evidence was harmless under Rule 44.2(a) where it was "substantially the same" as testimony admitted elsewhere); *Goodman v. State*, 302 S.W.3d 462, 473 (Tex. App. – Texarkana 2009, pet. ref'd) (holding that erroneous admission of evidence was harmless under Rule 44.2(a) where it was "cumulative" and "provides nothing beyond that already properly admitted as evidence").

### 3. Application

The search warrant for Lopez's apartment resulted in officers finding a plethora of gang-related material that was introduced at trial. Detective Sanchez testified about the significance of each of these items and how Lopez's possession of the various lists reflected his high rank within the gang. Most importantly, Detective Sanchez explained that the list containing Bustillos' name was a list of ex-members. As Lopez argues in his brief, the jury could have perceived this item as a "hit list" for those ex-members based on the other testimony throughout trial explaining the consequences for leaving the Barrio Azteca gang.

But it is this very same testimony introduced at trial unrelated to the search warrant that renders the discovered items cumulative. For example, other testimony amply established that Lopez and his group would be motivated – or, perhaps, even required – to assault ex-members on sight. And other testimony established that Lopez was a current member of the Barrio Azteca gang and that Bustillos was an ex-member. In addition, Detective Sanchez testified that, through past investigations, he knew Lopez was a high-ranking member. Finally, Detective Sanchez generally painted a detailed and negative portrait about the gang's illicit activities. Thus, the same conceptual facts shown by the fruits of the search warrant – that Lopez was a member of the Barrio Azteca gang, that he was a high-ranking member, and that he had a strong motivation to attack Bustillo – were all established by other evidence admitted at trial. Thus, any error in admitting those fruits was harmless, even under the heightened constitutional harmless-error standard of Rule 44.2(a), where the fruits of the search warrant were cumulative of other evidence. *See* TEX. R. APP. P. 44.2(a); *see also Ellison*, 494 S.W.3d at 328-29; *Goodman*, 302 S.W.3d at 473; *Hamrick*, 2004 WL 1078495, at *3. Therefore, we overrule Lopez's sixth issue presented for review.

**F.  Issue 7: Palacios' Statements and the Confrontation Clause Objection**

In his seventh and final issue, Lopez argues that the trial court abused its discretion in admitting, over his Confrontation Clause objection, Palacios' statements to Officer Barajas because Palacios did not testify at trial and because Palacios' statements were testimonial where they were made in the absence of an ongoing emergency. In response, the State argues conversely that: (1) Palacios' statements did not implicate the Confrontation Clause because they were nontestimonial, as Palacios made them immediately upon Officer Barajas' arrival to the scene and while an ongoing emergency was present; and (2) any error was harmless because Palacios'

41

statements were cumulative of other evidence.

*1. Underlying Facts*

More than a dozen officers were dispatched to Adventureros on a "shots fired" call. At trial, Officer Barajas testified that he saw a chaotic scene as he parked in front of the bar. About 25 people were running around, yelling, getting into vehicles, and driving away. There were bullet holes in multiple cars in addition to the bar itself. Due to the nature of the call, Officer Barajas was concerned about anyone wielding a gun and about anyone who might be injured. Within seconds of exiting his patrol unit, he saw a man standing nearby who appeared frightened, and this man waved him over. Although yelling at first, the man brought his tone down, kept looking around, and told Officer Barajas that an Azteca named Garfield "shot the place up" before leaving in a grey Chrysler 300. When Officer Barajas tried to get the man to give more information, the man said he could not be seen talking to officers and began walking away. However, Officer Barajas convinced the man to get in the back seat of the patrol unit, identified him as Lorenzo Palacios, and then let him leave. Officer Holguin then relayed the information he received over the radio.

*2. Standard of Review*

As noted in Issue Four above, a trial court's decision to admit evidence is reviewed under an abuse-of-discretion standard. *See Johnson*, 490 S.W.3d at 908. If the admission of evidence involved a constitutional legal ruling such as whether a statement is testimonial or nontestimonial, the appellate court gives almost total deference to the trial court's determination of historical facts but reviews *de novo* the trial court's application of the law to those facts. *See Langham v. State*, 305 S.W.3d 568, 576 (Tex. Crim. App. 2010).

*3. Applicable Law*

The Confrontation Clause of the Sixth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. CONST. amend. VI; *Crawford v. Washington*, 541 U.S. 36, 42 (2004); *Pointer v. Texas*, 380 U.S. 400, 406 (1965). The Confrontation Clause prohibits the admission of "testimonial" out-of-court statements by a witness who does not appear at trial unless: (1) the witness is unavailable to testify; and (2) the defendant had a previous opportunity to cross-examine the witness. *Crawford*, 541 U.S. at 53-54. Once a defendant raises a Confrontation-Clause objection, the burden shifts to the State to prove either that: (1) the proffered statement does not contain testimonial hearsay and thus does not implicate the Confrontation Clause; or (2) the statement does contain testimonial hearsay but is nevertheless admissible. *See De La Paz v. State*, 273 S.W.3d 671, 680-81 (Tex. Crim. App. 2008). In the instant appeal, the parties are concerned with only the first avenue for admissibility.

A statement is testimonial if "in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" *Ohio v. Clark*, 576 U.S. 237, 245 (2015) (quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011)). As one example of a situation where the primary purpose of a statement is nontestimonial, the United States Supreme Court held in *Michigan v. Bryant* that the statements made by a victim about his assailant were not testimonial because the circumstances objectively indicated that the conversation was primarily aimed at enabling police assistance to meet an ongoing emergency, not establishing evidence for the prosecution. *Bryant*, 562 U.S. at 377-78; *see*

*also Clark*, 576 U.S. at 245. Ultimately, where the primary purpose of an out-of-court statement was not to create an out-of-court substitute for trial testimony, the out-of-court statement is nontestimonial, and the Confrontation Clause is simply not implicated. *See Clark*, 576 U.S. at 245.

*4. Application*

Here, the circumstances show that the conversation between Officer Barajas and Palacios was aimed at addressing an ongoing emergency. Upon being dispatched to a "shots fired" call, officers saw a chaotic scene in which multiple bullet holes were lodged in various cars, and the bar itself, while dozens of people were frantically leaving the scene. Officer Barajas explained that he was concerned about anyone wielding a gun due to the nature of the call, and surreptitiously within seconds of his arrival, Palacios waved him over and told him information directly germane to finding and subduing the shooter, namely, the shooter's moniker and a description of his vehicle. After Officer Holguin relayed this information over the radio, two other officers were able to stop Lopez's vehicle because it matched the description. Based on the nature of the offense, the unsecured scene, the timing of the conversation, and the content of the statements at issue, we would be hard-pressed to find a situation more clearly revealing an ongoing emergency than the one at issue here. *See Bryant*, 562 U.S. at 377-78; *see also Clark*, 576 U.S. at 245.

In his brief, Lopez directs our attention to the fact that Palacios stated Lopez had already left the scene, and Lopez points to the general logic of *Vinson*, *Mason*, and *Davis* for the proposition that statements made to an officer arriving at the scene are testimonial if the victim and defendant are clearly separated by some amount of physical distance. *See Vinson v. State*, 252 S.W.3d 336, 341-42 (Tex. Crim. App. 2008) (holding that the situation turned into a non-emergency setting in which the responding officer was simply interviewing the victim where the

44

officer had removed the defendant from the residence and placed him in a patrol car prior to interviewing the victim); *Mason v. State*, 225 S.W.3d 902, 911-12 (Tex. App. – Dallas 2007, pet. ref'd) (holding that the victim's statements to a responding officer were testimonial where: (1) the officer interviewed the victim about the entire offense while she was standing at the doorway to her residence; and (2) the officer then proceeded to the bedroom where the defendant had been sleeping and interviewed him about the offense); *Davis v. State*, 268 S.W.3d 683, 705 (Tex. App. – Fort Worth 2008, pet. ref'd) (holding that the victim's statements to the responding officer were testimonial primarily based on the fact that the criminal situation was not in progress where the defendant had already left the scene at the time the officer arrived to speak to the victim). As an initial matter, such logic would be inapposite here because Palacios was not the victim – in fact, the officers did not know who was a victim upon their arrival. But in any case, the distinguishing feature in Lopez's cited cases is that the totality of the circumstances revealed, unequivocally, that any criminal situation was no longer in progress and that no imminent danger was posed to the declarant or the responding officer. By comparison, the situation here involved an emergency situation with a yet-to-be-apprehended gunman who had fired multiple shots in an area occupied by a large crowd. *See Bryant*, 562 U.S. at 376-77 (holding that the elicited statements at issue were nontestimonial where police interrogation of the shooting victim had the primary purpose of responding to the emergency of a roaming gunman).

Therefore, we hold that Palacios' statements were nontestimonial because their primary purpose was not to create an out-of-court substitute for trial testimony. *See Clark*, 576 U.S. at 245; *Bryant*, 562 U.S. at 377-78; *see also, e.g.*, *Villanueva v. State*, 576 S.W.3d 400, 405 (Tex. App. – Houston [1st Dist.] 2019, pet. ref'd); *Duchesneau v. State*, Nos. 02-18-00321-CR, 02-18-00322-

CR, 2019 WL 2455619, at *2 (Tex. App. – Fort Worth June 13, 2019, pet. ref'd) (mem. op., not designated for publication) (cases holding that responses to preliminary questions by police at the scene of a crime while police are assessing and securing the scene are generally not testimonial). And the trial court did not abuse its discretion in overruling Lopez's Confrontation Clause objection to Palacios' statements because the statements did not implicate the Confrontation Clause. *See De La Paz*, 273 S.W.3d at 680-81. For this reason, we overrule Lopez's seventh and final issue presented for review and need not address the State's harmless-error argument on this issue.

## IV. CONCLUSION

We affirm the trial court's judgment.


GINA M. PALAFOX, Justice

November 17, 2020

Before Alley, C.J., Rodriguez, and Palafox, JJ.

(Publish)